**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SISKIYOU REGIONAL EDUCATION
PROJECT,
                    *Plaintiff-Appellant,*

                    v.

UNITED STATES FOREST SERVICE;
SCOTT CONROY, Forest Supervisor
Siskiyou National Forest; LISA
BARTON; ROBERT BARTON; GERALD
HOBBS,
          *Defendants-Appellees.*

No. 06-35332

D.C. No.
CV-03-03013-JPC

SISKIYOU REGIONAL EDUCATION
PROJECT,
                    *Plaintiff-Appellee,*

                    v.

UNITED STATES FOREST SERVICE;
SCOTT CONROY, Forest Supervisor
Siskiyou National Forest; GERALD
HOBBS,
                    *Defendants,*

                    and

LISA BARTON; ROBERT BARTON;
LISA BARTON; ROBERT BARTON,
WALDO MINING DISTRICT,
          *Defendants-Appellants.*

No. 06-35373

D.C. No.
CV-03-03013-HO

SISKIYOU REGIONAL EDUCATION
PROJECT,

*Plaintiff-Appellee,*

v.

UNITED STATES FOREST SERVICE;
SCOTT CONROY, Forest Supervisor
Siskiyou National Forest; LISA
BARTON; ROBERT BARTON,

*Defendants,*

WALDO MINING DISTRICT,

*Defendant,*

and

GERALD HOBBS,

*Defendant-Appellant.*

No. 06-35381

D.C. No.
CV-03-03013-JPC

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael R. Hogan, District Judge, Presiding

Argued and Submitted
February 7, 2008—Portland, Oregon

Filed May 7, 2009

Before: Pamela Ann Rymer, Thomas G. Nelson and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez

**COUNSEL**

Peter M.K. Frost, Western Environmental Law Center, Eugene, Oregon; Roger Flynn, Jeffrey C. Parsons, Western Mining Action Project, Lyons, Colorado, for plaintiff-appellant Siskiyou Regional Education Project.

Sue Ellen Woolridge, Lane M. McFadden, Lisa Jones, Brian C. Toth, attorneys, Enviromental & Natural Resources Division, Department of Justice, Washington, D.C., for defendant-appellee United States Forest Service.

James L. Buchal, Murphy & Buchal LLP, Portland, Oregon, for Robert Barton.

David Young, Law Offices of David Young, Los Angeles, California; Christopher L. Cauble, Cauble, Dole & Sorenson, Grants Pass, Oregon, for Gerald Hobbs.

---

**OPINION**

PAEZ, Circuit Judge:

Siskiyou Regional Education Project ("SREP") and intervenor miners Robert Barton ("Barton") and Gerald Hobbs ("Hobbs") appeal the district court's rulings in favor of the United States Forest Service ("Forest Service") on claims brought in connection with the Forest Service's interpretation of Mineral Management Standard and Guideline MM-1 ("MM-1"), a mining-related directive contained in the Forest Service's Northwest Forest Plan ("NFP").

The NFP provides that Standards and Guidelines do not apply when contrary to existing law or regulation. Although 36 C.F.R. § 228.4(a) (2002), a Forest Service mining regulation, was in force when MM-1 was adopted, MM-1 and

§ 228.4(a) conflict in the extent of regulatory oversight of small mining operations in riparian reserves. Specifically, § 228.4(a) confers discretionary authority on district rangers to determine whether mining activity will result in significant disturbance to surface resources and therefore require a plan of operations. MM-1 appears to conflict with § 228.4(a) because it directs the district ranger to require a plan of operations for all mining activity within riparian reserves. To resolve this apparent conflict, in February 2002 the Forest Service interpreted MM-1 to impose the same threshold standard for a plan of operations as § 228.4(a). The Forest Service's interpretation of MM-1 lies at the heart of this dispute.

The district court rejected SREP's challenge to the Forest Service's interpretation of MM-1, and granted summary judgment to the Forest Service. The district court also limited intervention by Barton and Hobbs to the remedial phase of the litigation, if necessary. The court dismissed as moot Barton's separate action that had been consolidated with SREP's suit. The court also struck Hobbs's Answer to SREP's First Amended Complaint on the ground that it raised claims that exceeded Hobbs's limited role in the litigation.

On appeal, SREP challenges the district court's grant of summary judgment in favor of the Forest Service. SREP maintains that the Forest Service's interpretation of MM-1 as "contrary to" § 228.4(a), and thus without force insofar as it imposes additional restrictions on mining activity in riparian reserves, was arbitrary and capricious. Barton appeals the district court's denial of his motion to intervene at the merits phase of SREP's suit against the Forest Service, which would have permitted him to assert that the Forest Service lacks the authority to regulate mining under the NFMA. He also challenges dismissal of his separate action as moot. Barton argues that because the National Forest Management Act of 1976 ("NFMA") does not grant the Forest Service authority to regulate mining, its attempt to do so in the NFP is unenforceable.[1]

---

[1]That is, although Barton agrees with the Forest Service, that MM-1 should not be construed to limit mining in riparian reserves, his contention

Barton further argues that even if the Forest Service is vested with this authority, its interpretation of MM-1 was reasonable and entitled to deference. Last, Hobbs argues that the counterclaims and affirmative defenses he raised in his Answer to SREP's First Amended Complaint were improperly stricken.

At the outset, we conclude that, contrary to the Forest Service's objections, we have jurisdiction over final agency action pursuant to 28 U.S.C. § 1291. We affirm both the district court's grant of summary judgment in favor of the Forest Service, and the court's rulings regarding Barton and Hobbs.

## I.  FACTUAL AND PROCEDURAL HISTORY

*Streams and Mining in the Siskiyou National Forest*

The Siskiyou National Forest contains streams and rivers that provide habitat for several fish species, including coho and chinook salmon and steelhead trout. Several of these species, including coho salmon, have been listed as threatened or

---

is broader in scope: he argues that the Forest Service lacks authority to regulate mining under NFMA at all. Because we ultimately conclude that Barton's claims are moot, we need not directly address his contention that the Forest Service lacks the authority to regulate mining under the NFMA. We note, however, that the Supreme Court, and at least one of our sister circuits, have acknowledged this authority. *See Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 585 (1987) ("[U]nder the National Forest Management Act . . . the Forest Service under the Secretary of Agriculture is responsible for the management of the surface impacts of mining on federal forest lands.") (citation omitted)); *Park Lake Res. LLC v. USDA*, 197 F.3d 448, 451 (10th Cir. 1999) (listing a provision of the NFMA as one of the many "statutory and regulatory provisions governing national forests upon which it might rely" in requiring modifications to a mining plan of operations). Although SREP contends that the Court's statement in *Coastal Commission* should be ignored as dicta, we "do not treat considered dicta of the Supreme Court lightly." *United States v. Choudhry*, 461 F.3d 1097, 1102 n.4 (9th Cir. 2006) (citing *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000)).

at risk under the Endangered Species Act. *See, e.g.*, 70 Fed. Reg. 37160, 3170-71 (June 28, 2005). Many of these same waterways have also been subject to gold mining claims since the mid-1800s. Currently, gold miners work the streams and rivers within the forest with "suction dredges," machines that separate gold from streambed material using a gasoline-powered motor that draws streambed material up through a flexible, two-to-four-inch intake hose and then discharges the material back into the stream bed. The co-existence of protected fish species and mining operations in streams and rivers raises concern because suction dredges are a popular method of mining the waterways within the forest, yet may cause harm to endangered fish.[2]

*Regulatory History*

A complex, interlocking web of statutes and regulations sets forth the Forest Service's authority to regulate mining operations in the streams and rivers within the Siskiyou National Forest. Historically, mining operations on public lands were subject to little regulation. *See generally* Laura S. Ziemer, *The 1872 Mining Law and the 20th Century Collide: A Rediscovery of Limits on Mining Rights in Wilderness Areas and National Forests*, 28 Envt'l L. 145, 146-47 (1998). The General Mining Act of 1872 (codified as amended in scattered sections of 30 U.S.C.), and the National Park Service Organic Act of 1897 ("Organic Act") (codified as amended in scattered sections of 16 U.S.C.) granted the Forest Service the authority to promulgate regulations for mining in national forests. *See United States v. Shumway*, 199 F.3d 1093, 1106-07 (9th Cir. 1999) (quoting 16 U.S.C. §§ 478 and 551). Pursuant to its authority under the Organic Act, the

---

[2]SREP contends that suction dredge mining is harmful to endangered fish. We note that, although this contention provides background information helpful to understanding the basis for SREP's lawsuit, the question whether suction dredge mining is harmful to fish is not before us and, accordingly, we do not address it.

Forest Service first adopted mining regulations in 1974. *See* 39 Fed. Reg. 31317 (Aug. 28, 1974). When the Forest Service issued its February 2002 interpretation of MM-1 that SREP challenges here, 36 C.F.R. § 228.4(a) (2002)[3] provided in pertinent part:

(a)   Except as provided in paragraph (a)(2) of this section, a notice of intention to operate is required from any person proposing to conduct operations which might cause disturbance of surface resources. Such notice of intention shall be submitted to the District Ranger having jurisdiction over the area in which the operations will be conducted. If the District Ranger determines that such operations will likely cause significant disturbance of surface resources, the operator shall submit a proposed plan of operations to the District Ranger.[4]

36 C.F.R. § 228.4(a) (2002); *see* 36 C.F.R. § 228.4(a)(4) (2005). Although this regulation requires a notice of intent in certain circumstances, it vests discretion in the district ranger to determine if the mining operation "will likely cause significant disturbance of surface resources." *Id.* In the event of such

---

[3]Since the Forest Service's February 2002 interpretation of MM-1, the Forest Service has promulgated revised regulations related to mining within the national forests. *See* 69 Fed. Reg. 41428 (July 9, 2004); 70 Fed. Reg. 32731 (June 6, 2005). The revised regulations retain the basic requirements of the earlier version, and do not materially affect suction-dredge mining. We continue to refer to the version of § 228.4 that was in force when the February 2002 interpretation issued, unless otherwise noted.

[4]A notice of intent need only contain information "sufficient to identify the area involved, the nature of the proposed operations, the route of access to the area of operations and the method of transport." 36 C.F.R. § 228.4(a)(2)(iii). In contrast, a plan of operations requires more detailed information, including "the approximate location and size of areas where surface resources will be disturbed" and "measures to be taken to meet the requirements for environmental protection." *Id.* at § 228.4(c).

a determination, the mining operator must submit a proposed plan of operations.

Section 228.4(a) contained five exceptions to the plan of operations requirement, including an exception for individuals desiring to search for and occasionally remove small mineral samples or specimens, and an exception for prospecting and sampling that does not cause significant surface resource disturbance or involve removal of more than a reasonable amount of mineral deposit for analysis and study. *Id.* at § 228.4(a)(1)(i)-(iv). Further, § 228.4(a) provided that "[a] notice of intent need not be filed: (i) Where a plan of operations is submitted for approval in lieu thereof, (ii) For operations excepted [by the provisions in § 228.4(a)(1)(i)-(v)]," and in certain other circumstances. *Id.* at § 228.4(a)(2).

Additionally, the NFMA requires the Forest Service to prepare for each forest a management plan that contains standards and guidelines specifying how the forest shall be managed. 16 U.S.C. §§ 1604(a), (e); *Lands Council v. Powell*, 395 F.3d 1019, 1032 (9th Cir. 2005) ("[The] NFMA requires the Forest Service to create a comprehensive Forest Plan for each national forest." (citations omitted)). Pursuant to this requirement, the Forest Service first adopted a plan for the Siskiyou National Forest in 1989. That plan was amended in 1994, in response to President Clinton's call for management reform of federal lands and waters within the range of the northern spotted owl. *See Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl*, Summary, April 13, 1994, *available at* http://www.reo.gov/library/reports/newroda.pdf [hereinafter *Record of Decision*].

The NFP contains an Aquatic Conservation Strategy ("ACS"), the purpose of which is to protect fish habitat and to maintain or restore riparian and aquatic ecosystems. *Id.* at 9. The ACS designates certain streams in the forest as riparian reserves, portions of watersheds where riparian-dependent

resources receive primary emphasis. *Id.* at 7; *see also* Michael C. Blumm, *The Amphibious Salmon: The Evolution of Ecosystem Management in the Columbia River Basin*, 24 Ecology L. Q. 653, 669 (1997) (discussing policy and procedures of ACS). To implement this strategy, the NFP contains standards and guidelines that address matters such as timber management, road construction, grazing, and restoration. *Record of Decision* at 9.

These "binding standards and guidelines . . . restrict certain activities within areas designated as riparian reserves or key watersheds." *Pacific Coast Fed'n of Fishermen's Ass'n, Inc., v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1032 (9th Cir. 2001); *see* 16 U.S.C. § 1604(i). By their own terms, however, the Standards and Guidelines "do not apply where . . . contrary to existing law or regulation." *Standards and Guidelines for Management of Habitat for Late-Successional and Old-Growth Forest Related Species Within the Range of the Northern Spotted Owl*, at A-6 (April 13, 1994), *available at* http:/www.reo.gov/library/reports/newsandga.pdf [hereinafter *Standards and Guidelines*]; *see also id.* at C1.

As noted above, the provision central to this dispute is Standard and Guideline MM-1 ("MM-1"), which provides:

> Require a reclamation plan, *approved Plan of Operations*, and reclamation bond *for all minerals operations that include Riparian Reserves.* Such plans and bonds must address the costs of removing facilities, equipment, and materials; recontouring disturbed areas to near pre-mining topography; isolating and neutralizing or removing toxic or potentially toxic materials; salvage and replacement of topsoil; and seedbed preparation and revegetation to meet Aquatic Conservation Strategy objectives.

*Standards and Guidelines* at C-34 (emphasis added). Read in isolation, MM-1 appears to require a plan of operation for *all*

mineral operations that include riparian reserves. Unlike § 228.4(a), which draws a distinction between mining operations that require only a notice of intent and those that require a more comprehensive plan of operations, MM-1 draws no such distinction for operations within riparian reserves.

The Forest Service addressed the tension between MM-1 and § 228.4(a) in a memorandum that it issued on February 5, 2002:[5]

---

[5]The Forest Service's interpretation of MM-1 has shifted over time. In 1995, after the adoption of the NFP, SREP filed suit against the Forest Service alleging that it violated the NFMA when it interpreted MM-1 to allow small placer mining activity, such as suction dredge mining, in a riparian reserve without requiring a plan of operations. *See Nat'l Wildlife Fed'n v. Agpaoa*, CV 95-3005-CO (D. Or. Jan. 23, 1995). That case settled when the Forest Service agreed to propose changes in management direction for suction dredge mining in riparian reserves. As the Forest Service explains, it then proposed an amendment to MM-1 in 1996 following the preparation of an environment assessment ('EA') and a finding of no significant impact. As amended, MM-1 would have required a plan of operations for mining activity in riparian reserves only when the Forest Service determined that such operations were "likely to significantly retard or prevent attainment of the Aquatic Conservation Strategy" objectives in the NFP. *Siskiyou Reg'l Educ. Project v. Rose*, 87 F. Supp. 2d 1074, 1081 (D. Or. 1999). However, because the Forest Service failed to comply with certain procedural requirements of the National Environmental Policy Act ("NEPA"), the *Rose* court invalidated the proposed amendment.

After *Rose*, the Forest Service began to interpret MM-1 to require a plan of operations for all mining activities in a riparian reserve. To that end, in 2001, the Forest Service, through initiation of a new NEPA process, sought to establish a "programmatic" method for approving plans of operation for suction dredge mining under MM-1. Under this approach, so long as a proposed plan of operations satisfied the programmatic criteria, there would be no need to subject a proposed plan of operations to a full NEPA review. Because the Forest Service never completed the NEPA process, it never implemented a programmatic approval process for suction dredge mining in riparian reserves. In 2002, the Forest Service adopted the interpretation of MM-1 that is at issue in this appeal.

To apply [S&G MM-1] to activities not meeting the "likely cause significant disturbance" test is not appropriate, and is contrary to law and regulation. If no significant surface disturbance is occurring, we have no reason to require a reclamation bond, nor would we be able to determine bond amount. In the areas covered by the Northwest Forest Plan or covered by other general management guidance or strategies, forest users can conduct non-significant surface disturbing activities without filing plans of operations per the intent of the Forest Service Mining Regulations. A Notice of Intent to Operate (NOI) will still be required if the proposed activity might cause disturbance of surface resources and it doesn't meet the provisions of 36 CFR 228.4(a)(2). The MM-1 standard and guideline applies only when the proposed activity is likely to cause significant surface disturbance. Because MM-1 would require plans of operations where [§] 228[.4(a)] would not, it was contrary to existing regulation insofar as it was interpreted to include plans of operation for all suction-dredge mining.

*Memorandum to Regional Foresters* (February 5, 2002). After the Forest Service issued this management directive, the Forest Service began to allow miners to undertake suction-dredge mining operations in riparian reserves within the Siskiyou National Forest upon the filing of a notice of intent, without requiring the submission or approval of a plan of operations. Barton's and Hobbs's mining operations were among those that were allowed to proceed without an approved plan of operations.

*Procedural History*

In 2003, SREP filed suit, alleging that the Forest Service's February 2002 interpretation of MM-1 violated the NFP and the NFMA, and, therefore, its decision to allow suction

dredge mining operations in riparian reserves without a plan of operations was arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*[6] Shortly after SREP filed suit, Hobbs, Barton and the Waldo Mining District ("WMD") moved separately to intervene. The district court granted intervention to Barton and Hobbs only as to the remedial phase of the litigation. Barton and WMD then filed a separate suit against the Forest Service, which the district court consolidated with SREP's suit.[7]

All parties filed cross-motions for summary judgment. In Barton's suit against the Forest Service, the district court granted summary judgment in favor of the Forest Service. The court concluded that Barton's claims were moot in light of the Forest Service's policy decision to require a plan of operations under MM-1 only when the mining operation posed a risk of significant surface disturbance. In SREP's suit against the Forest Service, the district court granted summary judgment in favor of the Forest Service, concluding that MM-1 was "contrary to" § 228.4(a) and that the Forest Service's narrow interpretation of MM-1 was reasonable and thus entitled to deference. SREP, Barton and Hobbs timely appealed.

## II.  JURISDICTION

*Final Agency Action*

**[1]** The Forest Service argues that we lack jurisdiction because SREP's complaint failed to challenge a final agency action and constituted an improper programmatic attack on

---

[6]SREP also alleged a claim under the Endangered Species Act, but that claim was dismissed without prejudice and is not part of this appeal.

[7]WMD was dismissed from the separate suit, and Barton was ordered to file an amended complaint which does not contain any allegations relating to WMD. Although WMD was included in Barton's notice of appeal, WMD does not advance a challenge to its dismissal from the separate suit. Therefore, any issues relating to WMD's dismissal are deemed waived. *See Eng v. Cooley*, 552 F.3d 1062, 1072 (9th Cir. 2009).

the Forest Service's policies. The right of judicial review under the APA is limited to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990). A "*wholesale* improvement" for a program cannot be sought by "court decree, rather than in the offices of [the agency] or the halls of Congress, where programmatic improvements are normally made." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (citing *Lujan*, 497 U.S. at 891). Rather, "[u]nder the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm." *Id.*

SREP has expressed more than a generalized dissatisfaction with the Forest Service's decision to limit the application of MM-1, even though SREP does not challenge the promulgation of the NFP itself or the § 228.4(a) regulations. SREP's complaint refers to specific instances of suction dredge mining operations that took place without an approved plan of operations in waterways administered by the Forest Service. The complaint further alleges that Barton and Hobbs "have mined their claims, and intend to do so in the future . . . . Those mining operations occurred without an approved plan or plans of operations, and without a reclamation plan or bond, where required."

**[2]** SREP's allegations challenge specific instances of the Forest Service's actions taken pursuant to its interpretation of MM-1, and therefore constitute more than a programmatic attack or a vague reference to Forest Service action or inaction. *See Oregon v. Natural Desert Ass'n v. United States Forest Serv.*, 465 F.3d 977, 990 (9th Cir. 2006). We therefore reject the Forest Service's arguments to the contrary, and conclude that, in light of SREP's challenges to final agency action, we have jurisdiction pursuant to 28 U.S.C. § 1291.**⁸**

---

**⁸**In light of our determination that SREP challenges final agency action, we need not address the "intra-circuit split" that we have recognized exists on the question whether the "final agency action" requirement of the APA is jurisdictional. *See Gros Ventre Tribe v. United States*, 469 F.3d 801, 809 (9th Cir. 2006).

*Standard of Review*

We review de novo a grant of summary judgment. *Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (citing *Ground Zero Ctr. for Non-Violent Action v. United States Dep't of Navy*, 383 F.3d 1082, 1086 (9th Cir. 2004)). The judicial review provisions of the APA govern our review of agency decision-making under the NFMA, because the NFMA does not contain an express provision for judicial review. *Id.* An agency decision may only be set aside under the APA if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.*; 5 U.S.C. § 706(a). This standard, while "narrow," nonetheless requires the court to "engage in a substantial inquiry[,] . . . a thorough, probing, in-depth review." *Native Ecosystems Council*, 418 F.3d at 960. "[T]he agency must present a rational connection between the facts found and the conclusions made." *Id.* (internal quotation marks omitted).

## III.  DISCUSSION

*Standard and Guideline MM-1*

As noted above, the NFP specifies that *none* of the Standards and Guidelines, including MM-1, apply if they are contrary to existing law or regulation. *Standards and Guidelines* at A-6, C-1. The Forest Service's February 2002 Memorandum to Regional Foresters interpreted MM-1 narrowly, concluding that a broader interpretation would result in a conflict between MM-1 and § 228.4(a). As we explain below, we agree with the Forest Service that its interpretation of MM-1 is entitled to deference.

*Whether the Forest Service's Interpretation is Entitled to Deference*

[3] "Agencies are entitled to deference to their interpretation of their own regulations, including Forest Plans." *Native*

*Ecosystems Council*, 418 F.3d at 960 (citation and internal quotations omitted); *see also Hells Canyon Alliance v. United States Forest Serv.*, 227 F.3d 1170, 1180 (9th Cir. 2000). Indeed, although forest plans are adopted under 16 U.S.C. § 1604(a), we have effectively treated forest plan directives as equivalent to federal regulations adopted under the APA, deferring to the Forest Service's interpretation of plan directives that are susceptible to more than one meaning unless the interpretation is plainly erroneous or inconsistent with the directive. *See Forest Guardians v. United States Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003) (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *Hells Canyon Alliance*, 227 F.3d at 1180 (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).[9]

---

[9]This "plainly erroneous or inconsistent" standard is commonly referred to as "*Auer*" deference, and is applied to agency interpretations of ambiguous regulations. *See Auer*, 519 U.S. at 452 (holding that the Secretary of Labor's interpretation of its own ambiguous regulation was entitled to deference); *Bassiri v. Xerox Corp.*, 463 F.3d 927, 931 (9th Cir. 2006) (applying *Auer* deference to the Department of Labor's interpretation of an ambiguous regulation); *Hells Canyon Alliance*, 227 F.3d at 1180 (9th Cir. 2000) ("Because the [Land Resources Management] [P]lan language is susceptible to more than one reasonable interpretation, we defer to the agency's interpretation." (citing *Auer*, 519 U.S. at 461)).

We have not explicitly relied on *Auer* in every case in which we have concluded that the Forest Service's interpretation of a forest plan was entitled to deference. In *Forest Guardians*, for example, we cited to *Thomas Jefferson*, not *Auer*, as providing the appropriate level of deference. Both *Forest Guardians* and *Hells Canyon Alliance*, however, confirm that the Forest Service's interpretations of ambiguous forest plan directives—just like agency interpretations of ambiguous regulations—are entitled to significant deference. Indeed, the same case, *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945), provides the basis for both *Jefferson*'s and *Auer*'s articulation of the proper degree of deference to an ambiguous regulation, including forest plans. We are therefore satisfied that the deferential standard set forth in *Forest Guardians* and in *Hells Canyon Alliance*, whether referred to as *Auer* deference or not, describes the proper degree of deference to which the Forest Service's interpretation of MM-1 is entitled.

**[4]** In contrast, where "neither the scope nor the effect" of the regulation in question is ambiguous, "[t]here is no call for deference to the agency's legal interpretation." *Lands Council v. Powell*, 395 F.3d 1019, 1034 (9th Cir. 2005) ("The Forest Service asserts that we owe its interpretation deference as a reasonable interpretation of an ambiguity in a Forest Plan . . . . There is no call for deference to the agency's legal interpretation of these two standards, however, because neither the scope nor the effect of the two standards is ambiguous." (citation omitted)); *see also Christensen v. Harris County*, 529 U.S. 576, 588 (2000) ("*Auer* deference is warranted only when the language of the regulation is ambiguous."). Thus, an agency may not, "under the guise of interpreting a regulation, . . . create *de facto* a new regulation." *Christensen*, 529 U.S. at 588. The fact that an agency's interpretation has fluctuated over time, however, does not make it unworthy of deference. *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 129 S. Ct. 865, 872 n.7 (2009) (citing *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007)).

### 1.   Ambiguity

SREP contends that irrespective of the mandatory language in MM-1, it is not contrary to the discretionary elements of § 228.4(a). According to SREP, "MM-1 simply makes the decision for the line officer that mining in a riparian reserve requires a plan of operations."  Thus, SREP argues, this blanket requirement imposes a supplemental guideline that is consistent with, not contrary to, § 228.4(a).

Indeed, SREP points out that the Forest Service knew when it was developing the NFP that MM-1 would significantly limit mining operations in riparian reserves, and that MM-1 was in fact adopted to fulfill the Forest Service's duties under the NFMA to provide for a diversity of species. As support for its position, SREP relies on statements in a draft of the Forest Service's Final Supplemental Environmental Impact Statement for the NFP to show that it was intended to signifi-

cantly affect mining operations in order to protect wild salmon:

> The development of mineral resources may be limited by the land allocations and the standards and guidelines proposed in the alternatives. However, the more likely effect of designating areas for habitat for the northern spotted owl and other late-successional and old-growth related species would be that additional measures to protect habitat would be required under mineral leases and in plans for locatable mineral development.

*Draft Final Supplemental Environmental Impact Statement*, Chapter 3&4, *Affected Environment and Environmental Consequences*, SREP Excerpts of Record at 119.

While SREP's interpretation is not unreasonable, we agree with the Forest Service's assessment, as reflected in the February 2002 memorandum, that the meaning of MM-1 is not entirely "free from doubt." *Bassiri v. Xerox Corp.*, 463 F.3d 927, 931 (9th Cir. 2006) (quoting *Providence Health Sys.-Wash. v. Thompson*, 353 F.3d 661, 665 (9th Cir. 2003)). The first part of MM-1 requires plans of operations for *all* mineral operations involving riparian reserves. This provision conflicts with § 228.4(a), which was adopted long before MM-1 and requires a plan of operations only when a *district ranger* determines that the proposed mining operations will likely cause significant disturbance of surface resources. That is, while § 228.4(a) contemplates that a district ranger will undertake a case-by-case determination of whether a plan of operations is needed, MM-1 appears to impose such a requirement on all mining operations in riparian reserves.

The second part of MM-1, however, as noted in the February 2002 memorandum, refers to recontouring of disturbed areas, salvage and replacement of topsoil, and other details that must be included in an approved plan of operations. This

provision of MM-1 appears to encompass the same threshold standard as § 228.4(a), implying that only where the mining operation poses a risk of significant surface disturbance will a plan of operations or bond be required. The past disputes over the meaning of MM-1 in light of § 228.4(a) further highlight its opacity.[10] *See supra* n.5; *see also Bassiri*, 463 F.3d at 931.

[5] As previously noted, the NFP declares that any Standard and Guideline, including MM-1, shall not apply when contrary to existing law or regulation. Because MM-1 is susceptible to different interpretations and given the discretionary elements of § 228.4(a), we agree with the Forest Service that MM-1 is ambiguous. It is not clear whether MM-1's reference to *all* mining operations that include riparian reserves applies to those mining operations that are not likely to cause any significant disturbance of surface resources, or whether it applies to every operation in these designated areas.

[6] Thus, we will defer to the Forest Service's interpretation of MM-1 unless it is plainly erroneous or inconsistent with MM-1. "Under this standard, we defer to the agency's interpretation of its regulation unless an alternative reading is *compelled* by the regulation's plain language or by other indications of the agency's intent at the time of the regulation's promulgation." *Bassiri*, 463 F.3d at 931 (quoting *Shalala*, 512 U.S. at 512) (internal quotation marks omitted). The same reasons that compel the conclusion that MM-1 is ambiguous lead

---

[10]We note that in addition to the conflict over the meaning of MM-1 discussed in note 5, at least one other district court has weighed in on the meaning of MM-1 in the context of the Klamath Forest Plan ("KFP"). *See Karuk Tribe of Cal. v. United States Forest Service*, 379 F. Supp. 2d 1071, 1095 (N.D. Cal. 2005). In *Karuk Tribe*, the court upheld the Forest Service's interpretation of a directive contained in the KFP that incorporated MM-1, concluding that "the Forest Service has consistently, and reasonably, interpreted the Northwest Forest Plan and Klamath Forest Plan to address the inherent conflict between the mining regulations and the Northwest Forest Plan." *Id.* at 1098.

us to hold that the Forest Service's narrow interpretation is a reasonable reconciliation of MM-1 and § 228.4(a).

### 2. *The Forest Service's Interpretation of MM-1 Is Not Plainly Erroneous or Inconsistent with MM-1*

In light of the text of MM-1 and the binding force of the NFP Standards and Guidelines, SREP's mandatory interpretation would not be problematic if MM-1 were the only Forest Service directive at issue. As previously noted, however, *none* of the Standards and Guidelines—including MM-1—apply "where they would be contrary to existing law or regulation."

Under SREP's interpretation of MM-1, it requires a reclamation plan, approved plan of operations, and reclamation bond "for *all* minerals operations that include Riparian Reserves" (emphasis added). Section 228.4(a), in contrast, provides that a plan of operations shall be required only "[i]f the *District Ranger* determines that such operations will likely cause significant disturbance of surface resources." (emphasis added). We agree with the Forest Service that § 228.4(a) provides that a plan of operations is required *only when* significant disturbance of surface resources is likely—and therefore one is *not required* when significant disturbance is *not* likely. In other words, determining which operations are *likely* to cause significant disturbance of surface resources—and therefore require a plan of operations—requires a discretionary determination *by a district ranger*.[11]

Neither by its express terms, nor as interpreted by SREP, does MM-1 account for such a discretionary determination.

---

[11]We note that the Department of Agriculture's responses to public comments that it invited before promulgating the 2005 version of § 228.4(a) emphasize the discretionary elements of the regulation. *See* 70 Fed. Reg. 32713, 32720 (June 6, 2005) ("The environmental impacts of operating suction dredges, even small ones, are highly site-specific depending on the circumstances and resource conditions involved.").

Instead, it eliminates discretion by requiring plans of operations for mining activity that *might* cause disturbance of surface resources, yet are not *likely to do so*—and thus would require only a notice of intent under 36 C.F.R. § 228.4(a). The Forest Service's February 2002 interpretation is a reasonable effort to address and resolve the inconsistency between the two directives.

**[7]** We note that the Forest Service's interpretation is also consistent with Congress's long-recognized interest in the development of mineral resources. *See* 30 U.S.C. § 22 ("[A]ll valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase . . . ."); *see also* 16 U.S.C. § 478 (acknowledging the Secretary of Agriculture's authority under 16 U.S.C. § 551, and other provisions, to prescribe rules and regulations to prevent "depredations upon the public forests and national forests" but noting such authorization "shall not be construed as prohibiting any person . . . from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof"); 30 U.S.C. §§ 611-12 (discussing how the United States's right to manage and dispose of vegetative surface rights must be balanced against the prospecting, mining, or processing operations of miners). The Forest Service acknowledges, and we have recognized, that mining rights may not be unreasonably restricted in the performance of Forest Service duties. *See United States v. Shumway*, 199 F.3d 1093, 1107 (9th Cir. 1999) (internal citation omitted).

In sum, MM-1 is susceptible to several reasonable interpretations. To adopt SREP's interpretation would require a plan of operations for every mining operation involving riparian reserves, and would be contrary to § 228.4(a)'s specification that a plan of operations is required only after the district ranger so determines. The Forest Service's narrow February 2002 interpretation of MM-1 is a reasonable attempt to reconcile the conflict between the two directives, and was neither

legally erroneous nor contrary to MM-1. We therefore defer to the Forest Service's interpretation, and affirm the grant of summary judgment to the Forest Service.

## IV. BARTON

*Barton's Motion to Intervene*

The district court granted Barton's motion to intervene in part, limiting intervention to the remedial phase of the litigation.[12] Barton contends that he should have been granted intervention in all phases of the litigation, either as of right under Federal Rule of Civil Procedure 24(a), or permissively under Rule 24(b).

[8] Intervention on the merits would have allowed Barton to present his argument that MM-1 is invalid because the Forest Service lacks authority to regulate mining under the NFMA. In light of our disposition of SREP's appeal, however, there is no need for us to address whether the district court erred by failing to allow Barton to intervene at the merits stage of the litigation. Because there is no need for any further district court proceedings, there is no need for us to address Barton's challenge to the district court's ruling. We therefore dismiss Barton's appeal as moot. *See League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1301 & n.1 (9th Cir. 1997); *United States v. Ford*, 650 F.2d 1141, 1142-43 (9th Cir. 1981).

---

[12]WMD, which joined in Barton's motion to intervene in the district court, was denied leave to intervene at any stage in the litigation. On appeal, however, WMD does not challenge the district court's refusal to allow it to intervene. Therefore, although WMD appealed the denial of its motion, any challenge to the district court's ruling is waived. *See Eng*, 552 F.3d at 1072.

*Barton's Separate Lawsuit*

The district court dismissed Barton's separate suit, challenging the Forest Service's authority to regulate mining under the NFMA, as moot because he failed to allege actual or potential injury. We agree.

**[9]** "Mootness is a question of law reviewed de novo." *Barter Fair v. Jackson County*, 372 F.3d 1128, 1133 (9th Cir. 2004) (citing *Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1116 (9th Cir. 2003)). "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Serena v. Mock*, 547 F.3d 1051, 1053 (9th Cir. 2008) (quoting *Feldman v. Bomar*, 518 F.3d 637, 642 (9th Cir. 2008)).

> A case becomes moot whenever it loses its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law. The question is not whether the precise relief sought at the time . . . [the case] was filed is still available. The question is whether there can be any effective relief.

*Earth Island Inst. v. United States Forest Serv.*, 442 F.3d 1147, 1157 (9th Cir. 2006) (citing *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365 (2008) (internal quotation marks and alterations omitted)).

**[10]** Barton contends that because the Forest Service's current interpretation of MM-1 could change, his suit falls within the exception to the mootness doctrine reserved for voluntary cessation of unlawful activity. *See Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 192 (2000). Barton, however, does not dispute that the Forest Service's current policy, as reflected in the February 2002 memorandum to

the Forest Rangers, is not to require a plan of operations for mining activities unless such a plan would be required under § 228.4(a). Indeed, although the Forest Service does not dispute that it may change its policy, the record does not indicate that the Forest Service has any intention of changing its interpretation of MM-1 to encompass mining activity beyond that suggested by its current interpretation. Moreover, there is no need, in light of our determination to affirm the district court's judgment in favor of the Forest Service—which ultimately inheres to the benefit of Barton—to address the merits of Barton's separate claims.

**[11]** In sum, the district court did not err in dismissing as moot Barton's separate suit, and we therefore affirm the court's ruling on this issue.

## V.   HOBBS'S APPEAL

**[12]** Finally, Hobbs appeals the district court's grant of the Forest Service's motion to strike his answer to SREP's amended complaint and to assert his own "counterclaims." The district court determined that Hobbs's arguments were non-mandatory cross-claims against the Forest Service, and were contrary to the district court's earlier order restricting Hobbs's intervention to the "remedial phase" of the litigation. We conclude that the district court's decision to strike Hobbs's claims pursuant to Federal Rule of Civil Procedure 12(f) did not constitute an abuse of discretion. *See Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000).

Although the district court granted Hobbs intervention only as to the "remedial phase" of the litigation, his answer sought to raise issues related to the merits of the litigation. Hobbs's "affirmative defenses" and "counterclaims" were either defenses that the Forest Service could have raised in response to SREP's suit, or attempts to state independent claims against the Forest Service. These claims exceeded the bounds of the limited intervention granted to Hobbs. The district court's rul-

ing striking Hobbs's answer was well within the court's discretion and we therefore affirm the court's ruling on this issue.

For the reasons stated, the judgment of the district court in SREP's action against the Forest Service is AFFIRMED. The dismissal of Barton's separate suit as moot is AFFIRMED. Barton's appeal in SREP's action against the Forest Service is DISMISSED as moot, and the striking of Hobbs's answer is AFFIRMED.

AFFIRMED in part; DISMISSED in part.