**CENTER FOR BIOLOGICAL DIVERSITY, Plaintiff,**

v.

**Nicole BRANTON, et al., Federal Defendants,**

**and**

**Ward Arizona Ranch Properties, LLC, Defendant–intervenor**

**No. CV 10–330 TUC AWT**

United States District Court, D. Arizona.

Signed June 25, 2015

Filed June 26, 2015

Todd Christopher Tucci, Advocates for the West Incorporated, Boise, ID, for Plaintiff.

Andrew Allen Smith, U.S. Dept. of Justice, Albuquerque, NM, for Federal Defendants.

Karen Budd–Falen, Andrea R. Buzzard, Kathryn Brack Morrow, Budd–Falen Law Offices LLC, Cheyenne, WY, for Defendant–Intervenor.

## ORDER RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT [95] [104] [107]

A. Wallace Tashima, United States Circuit Judge, Sitting by Designation

This case arises out of the reauthorization of a grazing permit ("the Proposed Action") on the Fossil Creek Range Allotment ("FCRA"), located in the Coconino National Forest in central Arizona. In 2013, pursuant to the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, the United States Forest Service ("Forest Service") issued a Decision Notice and Finding of No Significant Impact ("FONSI") (the "2013 Decision Notice and FONSI") approving the Proposed Action; in the same year, the United States Fish and Wildlife Service ("FWS") issued a Biological Opinion (the "2013 BiOp"), which assessed the impacts that the Proposed Action might have on the threatened Chiricahua Leopard Frog ("CLF"). Plaintiff Center for Biological Diversity (the "Center") challenges each agency action, asking this Court to grant summary judgment on its claims that the 2013 Decision Notice and FONSI violate the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*, and that the 2013 BiOp violates the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. §§ 1531 *et seq. See* Ctr.'s Mo. for Partial Summ. Jdgt., Dkt. 95. FWS and the Forest Service (together, the "Federal Defendants"), as well as intervenor Ward Arizona Ranch Properties, LLC (the "permittee")[1] filed cross-motions for summary judgment, asking this Court to deny the Center's motion and grant theirs as to each of the Center's claims. *See* Permittee's Cross–Mot. for Summ. Jdgt., Dkt. 104; Fed.Defs.' Mo. for Summ. Jdgt., Dkt. 107.

This Court has jurisdiction over the Center's claims pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 704. For the reasons set forth below, the Court GRANTS in part and DENIES the Center's motion for summary judgment; and GRANTS in part and DENIES in part the Federal Defendants' and the permittee's motions for summary judgment.

## I. *The Statutory and Regulatory Framework*

### A. The NFMA

The Forest Service is charged with administering the lands of the National Forest Service, which include the Coconino National Forest. *See* 36 C.F.R. § 200.1. The Forest Service is "required by statute and regulation to safeguard the continued viability of wildlife in the Forest." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 961 (9th Cir.2002). Among other things, the Forest Service must comply with the mandate of the NFMA that the "Forest Service ... develop a land and resource management plan ('forest plan') for each forest that it manages." *Id.* (citing 16 U.S.C. § 1604). Each forest plan must comply with a series of substantive requirements set forth in the NFMA. *See* 16 U.S.C. § 1604(g)(3) (providing that forest plans must be "developed to achieve" various goals, including "consideration of the economic and environmental aspects of various systems of renewable resource management ... to provide for outdoor recreation" and to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives").

---

**1.** Ward Arizona Ranch Properties currently holds a livestock grazing permit for the

FCRA. *See* Permittee's Mem. in Support of Motion to Intervene, Dkt. 48 at 6.

"In order to ensure compliance with the forest plan and the [NFMA], the Forest Service must conduct an analysis of each 'site specific' action . . . to ensure that the action is consistent with the forest plan." *Idaho Sporting Cong.*, 305 F.3d at 962; *see also* 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."). Pursuant to the Federal Land Policy and Management Act of 1976, livestock grazing is one of the site specific actions that the Forest Service may authorize within the National Forest System. *See Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1076 (9th Cir.2010). Livestock grazing is authorized on "allotments"—areas that have been designated within a national forest for this purpose—which are divided up into smaller areas, called "units" or "pastures." *Id.* at 1076–77.

The Forest Service authorizes livestock grazing on allotments via "three different types of site-specific actions, all of which must be consistent with the applicable Forest Plan." *Id.* at 1077 (citations omitted). First, the Forest Service issues grazing permits, which typically specify the number, kind, and class of livestock; the allotment to be grazed; and the period of use (usually ten years). *Id.* Second, the Forest Service develops an "allotment management plan" ("AMP"), a "document that specifies the program of action designated to reach a given set of objectives as to a specific allotment, including the manner in and extent to which livestock operations will be conducted in order to meet the multiple-use, sustained yield, economic, and other needs and objectives as determined for the lands, involved." *Id.* (citations and internal quotation marks omitted). AMPs are generally incorporated into the applicable grazing permit. *Id.* Third, the Forest Service develops and issues annual operating plans ("AOPs") or instructions ("AOIs"). *Id.* AOIs or AOPs translate the long-term directives of the applicable Forest Plan into instructions to the permittee for annual operations. *Id.* Because AOIs or AOPs are issued on an annual basis, they are "responsive to conditions that the Forest Service could not or may not have anticipated and planned for in the AMP or grazing permit." *Id.* (citation and internal quotation marks omitted). Typically, the Forest Service incorporates an AOI or AOP into the grazing permit, which governs the permittee's grazing operations for the ensuing year. *Id.*

### B. The ESA

The ESA has been described by the Supreme Court as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," reflecting a "conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *TVA v. Hill,* 437 U.S. 153, 180, 185, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The ESA is designed to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Under the ESA, either the Secretary of Commerce or the Secretary of the Interior is required to determine whether "any species is an endangered species or a threatened species" based on certain, specified factors. 16 U.S.C. § 1533(a)(1). A species is endangered if it "is in danger of extinction throughout all or a significant portion of its range," and is threatened if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. §§ 1532(6), (20). If a species is found to be either endangered or threatened, the

Secretary of the Interior or the Secretary of Commerce must concurrently "designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i). A species' critical habitat includes those areas occupied by the species at the time it is listed "on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i). FWS refers to these "physical or biological features" as "primary constituent elements" ("PCEs"). *See* 50 C.F.R. § 424.12(b).

Section 7(a)(2) of the ESA ("§ 7") requires every federal agency to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of the designated critical habitat of the listed species. 16 U.S.C. § 1536(a)(2). To assist agencies in complying with this provision, "§ 7 and its implementing regulations set out a detailed consultation process for determining the impacts of the proposed agency action." *Ctr. for Biological Diversity v. Salazar*, 804 F.Supp.2d 987, 990 (D.Ariz. 2011) (citing 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402). An agency seeking to authorize a particular action begins this process by preparing a "biological assessment" ("BA"), which evaluates (1) the potential effects of the action on the listed species and designated critical habitat; and, (2) whether any such species or habitat is likely to be adversely affected by the action. 16 U.S.C. § 1536(c); 50 C.F.R. § 402.12(a). If, after preparing the BA, the agency determines "that the proposed action is not likely to adversely affect any listed species or critical habitat," then it need not take any further action. 50 C.F.R. § 402.14(b)(1).

If, however, the "agency determines that its proposed action 'may affect' listed species or critical habitat, it must formally consult with the 'consulting agency.'" *Ctr. for Biological Diversity*, 804 F.Supp.2d at 990 (quoting 50 C.F.R. § 402.14(a)).[2] Once a request is submitted, the consulting agency must review all relevant information, evaluate the current status of the endangered or threatened species and its critical habitat, evaluate the effects of the action and cumulative effects on the listed species or its critical habitat, and, finally, formulate a BiOp that concludes whether or not the action "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. §§ 402.14(g), (h). The BiOp must include "a summary of the information on which the opinion is based" and "a detailed discussion of the effects of the action on listed species or critical habitat." 50 C.F.R. § 402.14(h)(1), (2).

## II. *The Proposed Action and Procedural History*

The FCRA is a 42,200–acre block of land that lies entirely within the Red Rock Ranger District of the Coconino National Forest. AR 17826, 17845. The FCRA is located approximately five miles southeast of Camp Verde, Arizona, and is bounded by Highway 260 on the north and Fossil Creek on the east. AR 25254. Livestock grazing has occurred on the FCRA since the late 1870s, and the Forest Service began permitting livestock grazing around 1908. AR 25255. Livestock grazing has

---

**2.** "There are two consulting agencies: FWS for freshwater or land-based species and National Marine Fisheries Service ('NMFS') for marine species." *Ctr. for Biological Diversity*, 804 F.Supp.2d at 990 n. 5.

caused significant environmental degradation throughout the allotment. AR 25255–25256.

In late 2006, pursuant to the Burns Amendment of 1995, the Forest Service initiated a process under NEPA of its planned reauthorization of grazing on the FCRA. *See Ctr. for Biological Diversity v. Provencio,* 2012 WL 966031, at *2 (D.Ariz., Jan. 23, 2012) ("*CBD I*")[3] NEPA, "our basic national charter for the protection of the environment," 40 C.F.R. § 1500.1(a), requires agencies to prepare an Environmental Impact Statement ("EIS") before undertaking "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C). Under NEPA's implementing regulations, a federal agency must prepare an environmental assessment ("EA"); based on the EA, the agency must either prepare an EIS or issue a FONSI. *See City of Las Vegas, Nev. v. FAA,* 570 F.3d 1109, 1115 (9th Cir.2009). If an agency issues a FONSI, it is excused from its obligation of preparing an EIS. *Id.*

The Forest Service began the NEPA review process for the grazing permit in effect on the FCRA by issuing a "scoping notice" in March of 2007. AR 1131. The notice recognized that the terms of the grazing permit in effect at the time were preventing the Forest Service from "meeting or moving toward desired conditions in an acceptable timeframe." AR 1131. Accordingly, the Forest Service proposed a new grazing regime for the FCRA, meant to ensure that livestock grazing was conducted "in a manner that maintains and/or moves the area toward Forest Plan objectives and desired conditions." AR 1131.

On April 2, 2009, the Forest Service released its final EA, analyzing the environmental impacts of reauthorizing the ten-year grazing permit according to the terms set forth in the March 2007 scoping notice ("the 2009 EA"). AR 12197–12384. In addition to preparing the 2009 EA, the Forest Service prepared a BA, *see* AR 7231–7314; based on this BA, the Forest Service submitted a request for formal consultation to FWS, *see* AR 7146. On February 9, 2009, FWS issued a BiOp ("the 2009 BiOp"). AR 12100–12150. Based on the 2009 EA and the 2009 BiOp, on April 28, 2009, the Red Rock District Ranger, Heather Provencio, signed a Decision Notice and FONSI ("the 2009 Decision Notice and FONSI"), approving reauthorization of the grazing permit. AR 12515–12534.

On June 4, 2010, the Center filed this action, asserting that the 2009 EA, the 2009 BiOp, and the 2009 Decision Notice and FONSI violated various provisions of the ESA, NFMA, and NEPA. *See* Complaint, Dkt. 1. The parties filed cross-motions for summary judgment. On January 23, 2012, this Court granted the Center's motion for summary judgment on all of its ESA claims and one of its NEPA claims, and granted the Federal Defendants' motion for summary judgment as to the Center's remaining claims. *See CBD I,* 2012 WL 966031, at *20.

In response, the Forest Service prepared a new EA, which was issued on May 15, 2013 ("the 2013 EA"). AR 25245–25466. The Forest Service also prepared a new BA, *see* AR 17622–17702; based on this new BA, the Forest Service submitted a new request for formal consultation to

---

**3.** The Burns Amendment required the Forest Service to conduct a NEPA review on "all allotments within the National Forest System unit for which NEPA analysis is needed" and to "modif[y] or re-issue[ ]" the terms and conditions of existing grazing permits "if necessary to conform to such NEPA analysis." Rescission Act of 1995, Pub.L. No. 104–19, § 504, 109 Stat. 194 (1995).

FWS, *see* AR M3734–M3735. On May 7, 2013, FWS issued the 2013 BiOp. AR 17823–17868. Based on the 2013 EA and the 2013 BiOp, District Ranger Provencio issued the 2013 Decision Notice and FON-·SI on May 17, 2013, again approving reauthorization of the grazing permit. AR 34117–34136.

The 2013 EA, the 2013 BiOp, and the 2013 Decision and FONSI are all based on the Proposed Action, which sets forth a grazing scheme similar to the one initially described in the March 2007 scoping notice. Among other things, the Proposed Action implements a grazing regime that: (1) permits livestock grazing under a "deferred rotation grazing scheme;" (2) limits livestock grazing to 3,600 Animal Unit Months ("AUMs");[4] and (3) permits grazing on a year-round basis. AR 34119–34121. The Proposed Action also implements several measures designed to mitigate the adverse effects of livestock grazing on the natural environment. AR 34122. Additionally, the Proposed Action includes detailed instructions as to how the grazing scheme is to be managed and monitored in order to "facilitate soil and vegetative improvement." AR 34120–34124.

On January 16, 2014, the Center filed its First Supplemental Complaint, alleging that the 2013 EA, the 2013 BiOp, and the 2013 Decision Notice and FONSI violated the ESA, the NFMA, and NEPA. *See* First Supplemental Complaint, Dkt. 81. The parties filed cross-motions for summary judgment. In its motion, the Center pressed only its ESA and NFMA claims, thereby abandoning its NEPA claim. *See* Order Setting Summary Judgment Briefing Schedule, Dkt. 85 at 2 ("Any claims not addressed in Plaintiff's summary judgment brief will be considered waived.").

## III. *Standard of Review of Administrative Action*

■■■ Summary judgment is an appropriate vehicle for resolving challenges to agency actions where the court's review is based primarily on an administrative record. *Ecology Ctr., Inc. v. Austin,* 430 F.3d 1057, 1062 (9th Cir.2005), *overruled on other grounds by Lands Council v. McNair,* 537 F.3d 981 (9th Cir.2008) (en banc). A court's role is not to resolve facts—that is the job of the agency as factfinder—but rather to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769 (9th Cir.1985).

■■■ This Court's review of agency decisions under the ESA and NFMA is governed by the APA. *See Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 891 (9th Cir.2002). Accordingly, the actions may be overturned only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)). Judicial review under the arbitrary and capricious standard is deferential: a court "will not vacate an agency's decision unless it 'has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 658, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S.

---

**4.** An Animal Unit Month is the amount of forage required by an animal unit (a mature cow) for one month, which is equal to approximately 800 pounds of forage. AR 25267.

29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). While review under the APA is "searching and careful," the standard is narrow: a court may not substitute its own judgment for that of the agency. *Ocean Advocates v. U.S. Army Corps of Eng'rs,* 402 F.3d 846, 858–59 (9th Cir.2005) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). Instead, it evaluates "whether the [agency's] decision was based on a consideration of the relevant factors," "whether there has been a clear error of judgment," and "whether the [agency] articulated a rational connection between the facts found and the choice made." *Id.* at 859 (citation and internal quotation marks omitted).

■ A court may not, however, attempt to make up for any deficiencies in the agency's decision by "supply[ing] a reasoned basis for the agency's action that the agency itself has not given." *State Farm,* 463 U.S. at 43, 103 S.Ct. 2856 (internal quotation marks omitted). The agency's action must be upheld, if at all, on the rationale employed by the agency. *Id.* at 50, 103 S.Ct. 2856.

## IV. *ESA Claims*

The Center's ESA claims are based on the alleged threats that the Proposed Action poses to the CLF and its critical habitat. In order to assess the specific arguments raised by the Center, the Court begins by conducting an examination of the history and current status of the CLF, as well as by providing a broad overview of the 2013 BiOp.

### A. Background on the Chiricahua Leopard Frog

On June 13, 2002, FWS issued a Final Rule listing the CLF as a threatened species (the "2002 Final Rule"). *See* Endangered and Threatened Wildlife and Plants; Listing of the Chiricahua Leopard Frog,

67 Fed.Reg. 40790 (June 13, 2002). Historically, CLFs lived in "cienegas (mid-elevation wetland communities often surrounded by arid environments), pools, livestock tanks (i.e., small earthen ponds), lakes, reservoirs, streams, and rivers" throughout parts of Mexico, Arizona, and New Mexico. *Id.* at 40790–91. During the latter half of the 20th century, these habitats were damaged by a wide array of maladies, including nonnative predators, drought, disease, and various human activities (such as livestock grazing, mining, and development). AR L4643. The resulting damage led to a decline in CLF population, which, in turn, led FWS to list the CLF as a threatened species. *See generally* 67 Fed.Reg. at 40800–806.

#### 1. *CLF Habitats*

In 2012, FWS promulgated a separate Final Rule designating the critical habitat of the CLF (the "2012 Final Rule"). *See* Endangered and Threatened Wildlife and Plants; Listing and Designation of Critical Habitat for the Chiricahua Leopard Frog, 77 Fed Reg. 16324, 16343 (Mar. 20, 2012). In its Final Rule, FWS identified two PCEs for the CLF: (1) "aquatic breeding habitat[s] and immediately adjacent uplands" ("PCE 1"); and, (2) "dispersal and nonbreeding habitat[s]" ("PCE 2"). *Id.* at 16343.

Breeding and dispersal habitats serve different functions in the conservation and perpetuation of the CLF. Breeding habitats are needed to provide "space, food, and cover necessary to sustain all life stages of [CLFs]." *Id.* at 16342. CLFs spend the great majority of their lives in breeding habitats. *Id.* In order for an area to serve as a breeding habitat, it must have certain features, including standing bodies of fresh water on a nearly perennial basis (FWS has labeled this requirement "PCE 1a"); emergent and/or submerged vegetation, root masses, undercut banks,

and/or fractured rock substrates ("PCE 1b"); they must be free of nonnative predators and chytridiomycosis, a fungal skin disease ("PCE 1c" and "PCE 1d", respectively); and, finally, they must have "[u]pland habitats that provide opportunities for foraging and basking" ("PCE 1e"). *Id.* at 16343.

Dispersal habitats play a different role in the preservation of the CLF. CLFs move from one breeding habitat to another; such movements are "crucial for conserving metapopulations."[5] *Id.* at 16335. CLFs cannot disperse between breeding habitats unless the corridors between them contain certain features. Specifically, these corridors cannot measure more than one mile over dry land, three miles over land with ephemeral or intermittent drainages, or five miles over land that contains perennial water courses (FWS has labeled these spacing limitations "PCE 2a"). *Id.* at 16343. For dry land corridors, there must be some vegetation cover or other structural features (such as rocks, downed trees, or organic debris) to provide CLFs with shelter and protection from predators; for ephemeral and perennial corridors, some water must be present ("PCE 2b"). *Id.* Finally, these corridors must be free of barriers that could block CLF movement, such as urban or agricultural developments, large reservoirs of water, or dams ("PCE 2c"). *Id.*

The 2012 Final Rule also identified thirty nine "critical habitat units" ("CHUs") throughout the known range of the CLF. *Id.* at 16345. These units "constitute[d]

FWS's current best assessment of areas that meet the definition of critical habitat for the [CLF]." *Id.*

### 2. The Recovery Plan

In 2007, FWS released a Final Recovery Plan for the CLF. *See* AR L4638–L5066.[6] The Recovery Plan identified four specific "Recovery Criteria"—milestones that, when met, would allow the CLF to be "considered for delisting," AR L4706—as well as twelve "Recovery Actions" aimed at helping FWS reach the Recovery Criteria. AR L4645.

The Recovery Plan divided the "entire known range" of the CLF into eight recovery units ("RUs"). AR L4707. To meet the goal of delisting, the Recovery Plan provides that "conservation of the [CLF] must occur in each RU." AR L4702. Specifically, before the CLF can be considered for delisting, each RU must have (among other things) "[a]t least two metapopulations located in different drainages" as well as "at least one isolated and robust population," each of which must "exhibit long-term persistence and stability." AR L4706. A metapopulation is defined as a "system of local populations connected by dispersing individuals moving among local populations;" a local population, in turn, is defined as "a set of individuals that interact with each other with a high degree of probability." AR L5043. Local populations within a metapopulation usually occupy distinct "suitable patches of habitat" (*i.e.* breeding habitats), which are connected by dispersal habitats. AR L5043. For

---

5. Metapopulations are defined in Part IV.A.2, *infra.*

6. Under § 4(f) of the ESA, the Secretary of Commerce must "develop and implement plans" known as "recovery plans" to ensure the "conservation and survival" of endangered and threatened species. 16 U.S.C. § 1533(f)(1). Recovery plans are meant to "be a basic road map to recovery" for the

listed species, and must, " 'to the maximum extent practicable,' incorporate (1) site-specific management actions necessary for the conservation and survival of the species, and (2) objective, measurable criteria by which to monitor the species' recovery." *Fund for Animals v. Babbitt*, 903 F.Supp. 96, 103 (D.D.C. 1995), *amended*, 967 F.Supp. 6 (D.D.C.1997) (quoting 16 U.S.C. § 1533(f)(1)(B)).

purposes of the Recovery Plan, FWS defines metapopulations as "consisting of at least four local populations" that are arranged such that "no local population will be greater than five miles from at least one other local population during some part of the year." AR L5043. At least one of these four local populations must contain at least 100 adult CLFs. AR L5043.

Metapopulations are crucial to the conservation and perpetuation of the CLF. 77 Fed.Reg. at 16335. If one local population within the metapopulation dies out because of drought, disease, or some other factor, it can "be recolonized via dispersal from adjacent populations" that are part of the metapopulation. *Id.*

3. *History of the CLF in the Coconino National Forest*

RU 5 includes 232 acres of the Coconino National Forest, known as the Buckskin Hills Unit (or just "the Buckskin Hills"). 77 Fed Reg. at 16355. The Buckskin Hills are one of the few places in which CLFs are currently found in RU 5, *see* AR L4717, and is one of only three areas that have been designated as a CHU in RU 5. *See* 77 Fed.Reg. at 16355. Within the Buckskin Hills, CLFs live almost exclusively in stock tanks, which are the only areas that contain large enough perennial pools to support CLFs on a year-round basis. AR 17845. FWS has identified twenty-two stock tanks that it currently considers to be "suitable" habitats for the CLF; however, not every stock tank has the features necessary to be considered a breeding habitat. AR 17845–48.

CLFs were first found in the Buckskin Hills in 1993 and, up until 2002, existed as a functioning metapopulation consisting of several connected stock tanks. AR 17846. In 2002, a drought wiped out many of these occupied stock tanks; by 2005, the population of CLFs in the Buckskin Hills had dwindled to one female and three males. AR 17848. In response, FWS, in collaboration with the Arizona Game and Fish Department ("AGFD"), started a captive breeding program at the Phoenix Zoo. AR 17848. After successfully breeding CLFs in captivity, FWS released several into a previously occupied stock tank in the Buckskin Hills (Middle Tank) in 2008. AR 17848. Since 2008, FWS has reintroduced CLFs to three other previously occupied stock tanks (Walt's, Black, and Buckskin Tanks).

In addition, FWS (in collaboration with the Forest Service, AGFD, and the permittee) has worked to improve CLF habitats in the Buckskin Hills by, among other things, removing nonnative fishes and sediment from stock tanks and fencing portions of the tanks to limit livestock access. AR 17849. These rehabilitative efforts have focused on protecting five tanks within in the Buckskin Hills (labeled "core" breeding habitats): Middle, Walt's, Black, Buckskin, and Sycamore Basin. AR 17849. These five tanks were selected because fifteen years of survey data demonstrated that: (1) they "consistently hold water, even in dry years"; ( 2) they "consistently have the appropriate types of emergent and submerged vegetation around their banks to provide for food, cover, and shelter of frogs in all li[f]e stages"; (3) they are "connected via drainages and upland habitat that the [CLFs] have used in the past to move between" these tanks; and (4) before FWS began actively managing CLFs and their habitats in the Buckskin Hills, these tanks "were the sites the [CLFs] originally occupied and selected for breeding sites." AR 17851. Although FWS recognized that "[a]ll other suitable stock tanks on the [FCRA] are important in terms of providing connectivity ... or expansion," its recovery efforts have not focused on these tanks because (according to FWS) "they are not critical to the con-

tinued survival of [CLFs] on the [FCRA]." AR 17851.

FWS's recovery efforts appear to be working. As of 2012, CLFs had spread to thirteen of the twenty-two tanks FWS has deemed "suitable" habitats in the Buckskin Hills (including the five core breeding habitats identified above), and were found breeding at seven of these thirteen tanks. AR 17844, AR 17846–48. This expansion and dispersal has occurred while livestock has continued to graze throughout the Buckskin Hills. AR 17860. However, the actual amount of grazing that has occurred since 2008 has been significantly less than the amount authorized in the Proposed Action. Specifically, while the Proposed Action would allow up to 3,600 AUMs of grazing per year, see AR 17827, the actual amount of grazing that occurred during 2008, 2010, 2011, and 2012 was less than 3,000 AUMs, see AR 29600.

### 4. Designation of CLF Critical Habitat in the Buckskin Hills

In the 2012 Final Rule, FWS identified part of the Buckskin Hills as a CLF critical habitat, dubbing this area Critical Habitat Unit 24 ("CHU 24"). 77 Fed.Reg. at 16355. Eight of the thirteen tanks that contained CLFs as of 2012—including each of the five core breeding habitats—fall within CHU 24: Middle, Walt's, Black, Buckskin, Sycamore Basin, Doren's Defeat, Partnership, and Needed. Id. CHU 24 also includes dispersal corridors (which lie mainly along streams and drainages) connecting these eight tanks. Id. A map of CHU 24 is provided below:

Id. at 16403.

### B. The 2013 BiOp [7]

After this Court's prior decision in CBD I, the Forest Service resubmitted its request for formal consultation to FWS, which in turn issued the 2013 BiOp. Pursuant to its statutory and regulatory mandate, FWS prepared the 2013 BiOp to determine whether or not the Proposed Action "is likely to jeopardize the continued existence of [the CLF] or result in the destruction or adverse modification of [its] critical habitat." 50 C.F.R. §§ 402.14(g), (h). The 2013 BiOp begins by providing a lengthy review of the history and status of the CLF in the Buckskin Hills, before conducting: (1) an analysis of the effects that the Proposed Action will have on the CLF, see AR 17851–17854; (2) an analysis of the effects that the Proposed Action will have on the CLF's critical habitat in the Buckskin Hills (CHU 24), which specifically addresses whether or not the Proposed Action will adversely affect each of the PCEs within the Buckskin Hills, see AR 17854–17857; and (3) an analysis of whether or not the Proposed Action is likely appreciably to reduce the CLF's ability to recover, see AR 17857–17859.[8]

Based on this analysis, the 2013 BiOp concludes that the Proposed Action: (1) "will not jeopardize the continued existence of the [CLF]" (the "no jeopardy determination"); (2) "will not risk recovery of the [CLF] on the FCRA" (the "recovery conclusion"); and (3) "will not destroy or adversely modify [the CLF's] critical habitat" (the "no adverse modification determination"). AR 17860. The 2013 BiOp offers three reasons in support of its conclusions: (1) that the "ecological condition of the FCRA should be maintained or improved during the 10–year life

7. The Court provides only a broad overview of the 2013 BiOp here, and elaborates upon specific findings and conclusions, where relevant, in its analysis of the Center's claims below.

8. Recovery is defined as "improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the [ESA]." 50 C.F.R. § 402.02.

of the project"; (2) that "[f]ull implementation" of the Proposed Action "is expected to greatly reduce the risk of direct impacts to individual [CLFs] through fencing and exclusion of livestock ... at important breeding sites"; and (3) that the CLF's "environmental baseline has improved on the Coconino National Forest as a result of the conservation actions implement by FWS" and its partners, despite "the presence of drought and livestock grazing on the [FCRA]." AR 17860–17861.

## C. Discussion

In its motion for summary judgment, the Center argues that the 2013 BiOp's no jeopardy and no adverse modification determinations are each arbitrary and capricious. The Court addresses each determination in turn.

### 1. *The 2013 BiOp's No Jeopardy Determination*

█ The Center argues that the 2013 BiOp's no jeopardy determination is flawed because it inadequately assesses the impact that the Proposed Action will have on the CLF's chances of recovery. In deciding whether or not an agency action is "likely to jeopardize the continued existence" of a particular species, the consulting agency must determine whether the action at issue "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. The parties agree that, in conducting its jeopardy analysis, FWS was required to make a specific determina-

tion as to whether or not the Proposed Action would "reduce appreciably the likelihood" that the CLF would recover. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 931 (9th Cir. 2008) ("*NWF* ") ("[T]he jeopardy regulation requires [a consulting agency] to consider both recovery as well as survival impacts."). Moreover, as noted above, there is no dispute that the 2013 BiOp actually draws a recovery conclusion—namely, that the Proposed Action will *not* appreciably reduce the likelihood of CLF recovery. *See* AR 17857; AR 17860.

The Center argues that this recovery conclusion is arbitrary and capricious for two reasons. The Court addresses each contention in turn.

### a. *The Proposed Action's Impact on Non–Core Habitats*

█ First, the Center argues that the 2013 BiOp's recovery conclusion is arbitrary and capricious because FWS "reviewed the impacts of the ... grazing scheme on only a subset of CLF breeding habitat"—the core breeding habitats—"without reviewing impacts to other breeding habitat or to any dispersal habitat." Ctr.'s Mem. of Ps. & As. in Support of Mo. for Partial Summ. Jdgmt. ("Ctr.'s Op. Br."), Dkt. 95–1 at 10. In essence, the Center argues that, in reaching its recovery conclusion, the 2013 BiOp "entirely failed to consider an important aspect of the" recovery problem—the adverse effects that the Proposed Action will have on habitats *other* than the five core breeding habitats.[9] *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856.

The Center is correct that the 2013 BiOp's recovery conclusion rests in large

9. The Center does not dispute that the 2013 BiOp accurately concludes that the Proposed Action will not adversely affect the five core breeding habitats (presumably because these habitats have fences that prevent livestock from grazing in them). Moreover, the Feder-

al Defendants do not dispute that: (1) the "non-core" habitats are important to the CLF's recovery in the Buckskin Hills; and (2) that the CLF's recovery on the Buckskin Hills is important to the overall recovery of the CLF.

part on its finding that the five core breeding habitats will be protected from the adverse effects of livestock grazing. *See, e.g.*, AR 17857 ("The minimum habitat features that we consider necessary to preserve the frog's recovery opportunities are based upon active management and protection of the core breeding habitats."). However, this finding is not the only basis for the 2013 BiOp's recovery conclusion. A careful examination of the 2013 BiOp reveals that FWS did, at the very least, *consider* the adverse effects that the Proposed Action will have on "non-core" stock tanks and dispersal corridors in reaching its recovery conclusion.

For example, in its analysis of the effects that the Proposed Action will have on the CLF's critical habitat, the 2013 BiOp examines the impacts that the Proposed Action will have on "[d]ispersal and non-breeding habitats" (PCE 2)—areas that are indisputably *not* core breeding habitats. AR 17856–17857. Moreover, it is clear that the 2013 BiOp conducted this analysis, at least in part, to determine whether or not the Proposed Action would affect the CLF's ability to recover: the 2013 BiOp specifically provides that its assessment of the Proposed Action's effect on the CLF's critical habitat (including its effect on PCE 2) is intended to "determine if the proposed action will result in effects that appreciably diminish the value of critical habitat for the *recovery* of a listed species." AR 17854 (emphasis added).

Similarly, in its analysis of the effects that the Proposed Action will have on the CLF, the 2013 BiOp concludes that the negative watershed effects associated with livestock grazing will be minimized by the "monitoring, mitigation, conservative use, and adaptive management" actions proposed by the Forest Service such that the core breeding habitats, *"as well as other suitable habitats on the allotment,* will

continue to function as breeding *and dispersal* sites." AR 17854 (emphases added). Once again, this statement makes clear that the 2013 BiOp looked at the effects that the Proposed Action will have on non-core breeding habitats. And, once again, it is clear that this analysis was conducted, at least in part, to determine whether or not the Proposed Action would affect the CLF's ability to recover: the 2013 BiOp specifically provides that these monitoring and management techniques are meant to ensure that the Proposed Action "will contribute to the species *recovery* within the action area." AR 17851 (emphasis added).

These explicit discussions of the impact that the Proposed Action will have on habitats *other than* the core breeding habitats make clear that FWS did not "entirely fail[ ]" to consider the effects that the Proposed Action will have on these habitats in coming to its recovery conclusion. *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856. Accordingly, the 2013 BiOp's recovery conclusion is not arbitrary and capricious for this reason.

■ The Center attempts to dismiss the foregoing analysis by arguing that neither of the portions of the 2013 BiOp recited above are contained, or even referenced, in the section of the 2013 BiOp dedicated to assessing the impacts that the grazing scheme will have on the CLF's chances of recovery. *See* AR 17857–17859. However, an agency action does not violate the APA simply because its written decision is imprecisely formatted. *See Rock Creek Alliance v. U.S. Fish & Wildlife Serv.*, 663 F.3d 439, 443 (9th Cir.2011) (rejecting the argument that FWS failed to consider the impact of an agency action on a threatened species' chances of recovery because the BiOp did not contain a "separate, distinct section[ ]" addressing recovery). Rather, the agency must demonstrate only that it did not *"entirely fail* [ ] to consider an

important aspect of the problem." *State Farm,* 463 U.S. at 43, 103 S.Ct. 2856 (emphasis added). For the reasons set forth above, it is clear that FWS met this threshold here.

Accordingly, the Court DENIES the Center's motion for summary judgment and GRANTS the Federal Defendants' and the permittee's motions for summary judgment as to this claim.

### b. The Recovery Plan Criteria

Next, the Center argues that the 2013 BiOp's recovery analysis is deficient because it fails to examine "whether the impacts of the grazing scheme … compl[y] with the[ ] recovery action and recovery criteria" set forth in the Recovery Plan, and fails to "examine whether the [grazing] scheme is consistent with the overall recovery strategy." Ctr.'s Op. Br. at 13.

■■■ This argument misstates the government's responsibility. As this Court previously explained, in *NWF,* "the Ninth Circuit was careful not to 'improperly import ESA's separate recovery planning provisions into the section 7 consultation process.'" *Ctr. for Biological Diversity,* 804 F.Supp.2d at 998 (quoting *NWF,* 524 F.3d at 936); *see also Fund for Animals, Inc. v. Rice,* 85 F.3d 535, 547 (11th Cir. 1996) (rejecting an argument whose "practical effect" would be to elevate a recovery plan "into a document with the force of law," because the applicable law "makes it plain that recovery plans are for guidance purposes only"). Recovery planning "is a different process and has different requirements than consultation." *Ctr. for Biological Diversity,* 804 F.Supp.2d at 998. The Center's argument is little more than a back-door attempt to incorporate ESA's recovery planning provisions into the § 7 consultation process.

Accordingly, the Court DENIES the Center's motion for summary judgment and GRANTS the Federal Defendants' and the permittee's motions for summary judgment as to this claim.

### c. Conclusion: No Jeopardy Determination

In sum, for the reasons set forth above, the Court DENIES the Center's motion for summary judgment and GRANTS the Federal Defendants' and the permittee's motions for summary judgment as to the Center's claim that the 2013 BiOp's no jeopardy conclusion is arbitrary and capricious.

### 2. The 2013 BiOp's No Adverse Modification Determination

Next, the Center argues that the 2013 BiOp's conclusion that the Proposed Action "will not destroy or adversely modify" the CLF's critical habitat in the Buckskin Hills (the eight stock tanks and dispersal corridors that are included in CHU 24) is arbitrary and capricious. Similar to its attack on the 2013 BiOp's no jeopardy determination, the Center's critique of the 2013 BiOp's no adverse modification determination focuses on the alleged failure to consider the adverse effects that the Proposed Action will have on non-core habitats: the three tanks that are not protected by fencing (Partnership, Doren's Defeat, and Needed Tanks), as well as the dispersal corridors between the tanks that are part of CHU 24. The Court addresses the Center's arguments with regards to the tanks and the dispersal corridors separately.

### a. The Unprotected Tanks

■■■ The 2013 BiOp acknowledges that the Proposed Action will adversely affect the three unfenced stock tanks that are part of the CLF's critical habitat in the Buckskin Hills (Needed, Doren's Defeat, and Partnership Tanks). *See* AR 1785517856.[10] However, as the Federal

---

**10.** Specifically, the 2013 BiOp recognizes that the Proposed Action is "expected to result in

Defendants argue, this finding does not render the 2013 BiOp's no adverse modification determination arbitrary and capricious. An adverse modification requires more than an adverse effect; rather, " '[a]dverse modification' occurs only when there is 'a direct or indirect alteration that *appreciably diminishes* the value of critical habitat." *Butte Envtl. Council v. U.S. Army Corps of Eng'rs,* 620 F.3d 936, 948 (9th Cir.2010) (quoting 50 C.F.R. § 402.02) (emphasis in original). Accordingly, "[a]n area of a species' critical habitat can be destroyed without appreciably diminishing the value of critical habitat for the species' survival or recovery." *Id.* As FWS' ESA consultation handbook explains:

> Adverse effects on individuals of a species or constituent elements or segments of critical habitat generally do not result in jeopardy or adverse modification determinations unless that loss, when added to the environmental baseline, is likely to result in significant adverse effects throughout the species' range, or appreciably diminish the capability of the critical habitat to satisfy essential requirements of the species.

*Id.* (quoting U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act* 4–34 (1998)).

In this case, it is clear that the adverse effects that the Proposed Action will have on Doren's Defeat, Partnership, and Needed Tanks will not "appreciably diminish" the value of CHU 24 as a whole. *Id.* Even assuming that the Proposed Action would render these three tanks uninhabitable, this fact alone would not "appreciably diminish[ ] the value of [the Buckskin Hills]

for the species' survival or recovery." *Id.* As the 2013 BiOp concludes, the protective fences around the five core stock tanks ensure that the Proposed Action will not hinder their ability to function as breeding habitats for the CLFs. AR 17855, 17856, AR 17860–61. Moreover, by protecting at least four breeding habitats within CHU 24 from the adverse effects of livestock grazing, FWS has ensured that the Proposed Action will not impair the ability of the Buckskin Hills to sustain a functioning metapopulation of CLFs. *See* AR L5043 (Recovery Plan defining a metapopulation as "consisting of at least four local populations").

Thus, even if the Proposed Action completely destroyed Doren's Defeat, Partnership, and Needed Tanks, it would not "appreciably diminish the capability of [CHU 24] to satisfy essential requirements of the [CLF]." *Butte,* 620 F.3d at 948 (citation and internal quotation marks omitted). As such, the 2013 BiOp's failure to account for the adverse effects that the Proposed Action will have on these three tanks does not render its no adverse modification determination arbitrary and capricious.

Accordingly, the Court DENIES the Center's motion for summary judgment and GRANTS the Federal Defendants' and the permittee's motions for summary judgment as to this claim.

#### b. The Dispersal Corridors

 Finally, the Center argues that the 2013 BiOp's no adverse modification conclusion is arbitrary and capricious because it fails adequately to address the adverse effects that livestock grazing has on dispersal corridors. Specifically, the Center argues that the 2013 BiOp fails adequately to explain its conclusion that

---

adverse effects" to PCE 1b—the emergent and/or submerged vegetation, root masses, undercut banks, and fractured rock substrates—and PCE 1e—the upland areas immediately adjacent to or surrounding the aquatic areas—within the three unprotected stock tanks. AR 17855–17856.

the Proposed Action "should not significantly reduce or modify" the various habitat features that make up PCE 2b (vegetative cover or other structural features in "overland and non-wetted corridors" and "ephemeral, intermittent, or perennial aquatic habits" in wetted corridors, AR 17857). Ctr.'s Op. Br. at 16–18.

As to this claim, the Center has the better of the argument. The 2013 BiOp provides no reasoning in support of its conclusion that the Proposed Action "should not significantly reduce or modify" PCE 2b. *See* AR 17857. Moreover, this conclusion is at odds with the 2013 BiOp's findings that: (1) livestock "tend to spend a disproportionate amount of their time in riparian zones," AR 17852; (2) livestock grazing can cause a multitude of maleffects to CLF dispersal corridors, including the "elimination of undercut banks that provide cover for frogs" and the "spread of disease and nonnative predators," *see* AR 17851–17854; and (3) there are no specific remedial measures identified by the 2013 BiOp that would ensure that these dispersal corridors are protected from the adverse effects of livestock grazing.[11] By failing fully to address these three findings in coming to its conclusion that the Proposed Action "should not significantly reduce or modify" PCE 2b, the 2013 BiOp fails to "articulate[ ] a rational connection between the facts found and the choice made." *Ocean Advocates*, 402 F.3d at 859 (citation and internal quotation marks omitted).

The Federal Defendants argue that its conclusion as to PCE 2b is supported by four separate findings in the 2013 BiOp. The Court finds none persuasive.

First, the Federal Defendants rely upon the 2013 BiOp's finding that "the ecological condition of the FCRA should be maintained or improved during the 10–year life of the project." AR 17860. However, the fact that the ecological condition of the FCRA *as a whole* will "be maintained or improved" does little to support the conclusion that the dispersal corridors within CHU 24 will not be adversely affected by livestock grazing over the life of the permit. The dispersal corridors in CHU 24 make up a small fraction of the 42,200 acres that fall within the FCRA, and the 2013 BiOp makes no finding as to whether this general conclusion applies to the dispersal corridors that fall within CHU 24. If anything, the 2013 BiOp supports the opposite conclusion: almost all of the dispersal corridors in CHU 24 lie along drainages and riparian corridors—the precise areas in which livestock "tend to spend a disproportionate amount of their time." AR 17852. Moreover, none of the improvements detailed in the 2013 BiOp are specifically designed to protect these dispersal corridors from the maleffects of livestock grazing.

Second, the Federal Defendants note that "[f]ull implementation of the EA (including conservation measures) is expected to greatly reduce the risk of direct impacts to individual [CLFs] through fencing and exclusion of livestock from significant portions of occupied areas at important breeding sites." AR 17860–17861. By its own terms, this finding applies only to the "important breeding sites," *i.e.,* core breeding habitats, and wholly fails to address the question of whether or not the Proposed

---

11. The Proposed Action does provide that "[l]ivestock exclosure fencing may be constructed at spring/seep and riparian areas if desired conditions are not achieved through the control of livestock grazing." AR 17828. However, the Ninth Circuit has held that an

agency may not rely on a "general commitment to future improvements" in coming to its no adverse modification conclusion, "absent specific and binding plans." *NWF*, 524 F.3d at 935–36.

Action will adversely affect the *dispersal corridors* that fall within CHU 24.

Third, the Federal Defendants rely upon the 2013 BiOp's finding that the "monitoring, mitigation, conservative use, and adaptive management proposed by the [Forest Service] for the FCRA will minimize potential effects of upland grazing on occupied frog habitat[s] ... such that these sites, as well as other suitable habitats on the [FCRA], will continue to function as breeding and dispersal sites." AR 17854. However, this finding specifically dealt with the adverse "watershed effects" associated with livestock grazing. AR 17854. It does not address the wide range of other adverse impacts that livestock grazing may have on dispersal corridors, including the "elimination of undercut banks that provide cover for frogs[,] loss of wetland and riparian vegetation and backwater pools[,] and spread of disease and nonnative predators." AR 17852.

Fourth, the Federal Defendants rely on the 2013 BiOp's finding that "grazing activities have not impeded [FWS'] ability to improve PCEs and increase frog populations at the[ ] core sites or for the [CLFs] to disperse to additional sites on their own." AR 17861. Evidence that CLFs dispersed throughout CHU 24 in the presence of livestock grazing of *similar or greater intensity* than the one set forth in the Proposed Action *might* support the conclusion that the Proposed Action would not "significantly reduce or modify" PCE 2b. However, while CLFs have spread throughout CHU 24 since being reintroduced to the Buckskin Hills in 2008, and while livestock grazing has occurred in the Buckskin Hills during that time, the actual amount of annual grazing that has occurred on the FCRA since 2008 is significantly less than the amount authorized in the Proposed Action. The Proposed Action would allow up to 3,600 AUMs of grazing per year, *see* AR 17827; however,

during 2008, 2010, 2011, and 2012, the actual amount of annual grazing was less than 3,000 AUMs. AR 29600. The fact that CLFs have prospered in the presence of a materially lesser number of livestock grazing cannot support the conclusion that they would continue to do so should livestock grazing increase to the amount authorized by the Proposed Action.

Indeed, the 2013 BiOp itself warns against drawing any conclusions from the fact that CLFs have spread throughout the Buckskin Hills since their reintroduction in 2008. *See* AR 17837. The 2013 BiOp notes that, even "if increasing trends are accurate, they may represent population response to temporarily favorable environmental conditions, such as adequate summer rains that allow dispersal, rather than an intrinsic improvement that will endure over time." AR 17837. Moreover, the 2013 BiOp details several "sources of bias that affect the conclusions" regarding increased CLF population in the Buckskin Hills. AR 17837. These findings further undermine the Federal Defendants' argument that the increase in CLF population in the Buckskin Hills since 2008 supports the conclusion that the Proposed Action will not adversely modify the dispersal corridors that fall within CHU 24.

Finally, unlike the unprotected stock tanks, the adverse modification of these dispersal corridors would, in fact, "appreciably diminish the capability of the critical habitat to satisfy essential requirements of the species." *Butte,* 620 F.3d at 948 (citation and internal quotation marks omitted). Viable dispersal corridors are needed to ensure that the Buckskin Hills can sustain a functioning metapopulation: without them, CLFs would be unable to spread from one stock tank to another, and would be unable to recolonize a stock tank should its local population die out. *See* 77 Fed.Reg. at 16342 (noting that dispersal habitats are needed to provide

"routes for connectivity and gene flow among local populations within a metapopulation"). Accordingly, adverse modification of the dispersal corridors would "appreciably diminish[ ] the value" of CHU 24. *Butte*, 620 F.3d at 948 (quoting C.F.R. § 402.02) (emphasis omitted).

In short, the 2013 BiOp's failure to account for the maleffects of livestock grazing in dispersal corridors renders its conclusion that the Proposed Action "should not significantly reduce or modify" PCE 2b, AR 17857, arbitrary and capricious. Accordingly, the Court GRANTS the Center's motion for summary judgment and DENIES the Federal Defendants' and permittee's motions for summary judgment as to this claim.

*c. Conclusion: No Adverse Modification*

In sum, for the reasons set forth above, the Court GRANTS in part and DENIES in part the Center's motion for summary judgment, and GRANTS in part and DENIES in part the Federal Defendants' and the permittee's motions for summary judgment as to the Center's claim that the 2013 BiOp's no adverse modification determination was arbitrary and capricious.

## V. *NFMA Claims*

In 1987, the Forest Service adopted the Coconino National Forest Plan (the "Forest Plan"), which remains in effect today. *See* AR 12756–13243. The Center argues the Proposed Action is inconsistent with two provisions of the Forest Plan, and thus violates the NFMA. The Court addresses each provision separately.

### A. The Wetlands Provision

■ First, the Center argues that the Proposed Action is inconsistent with the

Forest Plan's prohibition against activities that "will harass nesting birds, such as activities that are noisy or would damages nests or nesting habitat from May 1 to July 15" in "wetlands and open water containing emergent vegetation which provide nesting habitat" ("the Wetlands Provision"). AR 12968. The parties agree that (1) livestock grazing is an activity that would "harass nesting birds," and, (2) under the Proposed Action, livestock grazing would occur on the FCRA year round. AR 34119. The parties disagree, however, as to whether or not there are "wetlands" on the FCRA.[12] In the 2013 EA, the Forest Service concluded that there are "no wetlands known on [FCRA]." AR 25320. The Center disputes this finding, arguing that "wetlands" should be interpreted to include *any* riparian areas. *See* Ctr.'s Combined Opp. & Reply Summ. Jdgt. Brief ("Ctr.'s Reply Br."), Dkt. 112 at 13–15. In support of this argument, the Center points to various phrases in the Forest Plan and the 2013 EA that appear to use the terms "riparian habitats" or "riparian areas" interchangeably with the term "wetlands." *See id.* (citing AR 12966, 12776, 13238 (Forest Plan) and AR 25318, 25463–66 (2013 EA)). Because the FCRA has 332.7 acres of riparian vegetation and 21.3 miles of riparian streams, *see* AR 25320, the Center argues that permitting livestock grazing in these areas on a year-round basis violates the Forest Plan's prohibition against activities that harass nesting birds in wetlands between May 1 and July 15.

■ The Center's argument is wholly without merit. The Forest Plan defines a

---

12. The parties agree that there the FCRA contains areas with "open water containing emergent vegetation which provide nesting habitat." AR 12968. However, the Forest Service concluded that either: (1) livestock would not access these areas during the relevant period (May 1 through July 15); or (2) these areas do not provide suitable habitats for nesting. AR 34867. The Center does not challenge these findings here.

wetland as an area with "shallow standing water" or "seasonal to year-long saturated soils including bogs, marshes, and wet meadows." AR 13238. Determining whether or not an area fits this definition is a matter that falls within an agency's area of "technical expertise," and, as such, is entitled to "great deference." *Envtl. Def. Ctr., Inc. v. U.S. EPA*, 344 F.3d 832, 869 (9th Cir.2003); *see, e.g., Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 906 (5th Cir.1983) (noting in a Clean Water Act case that the determination of which lands are wetlands "requires an analysis of the types of vegetation, soil and water conditions that would indicate the existence of wetlands," and, as such "is the kind of scientific decision normally accorded significant deference by the courts"). The Center provides no reason why such deference should not afforded here.

Moreover, even if deference to the Forest Service's conclusion that there are no wetlands on the FCRA is not required, the Center's argument that all "riparian areas" are wetlands fails in light of the definitions provided by the Forest Plan itself. The Forest Plan defines riparian areas as those in which "free water" is present "within the common rooting depth of native perennial plants during at least a portion of the year." AR 13231. As noted above, "wetlands" include those areas with "shallow standing water" or "seasonal to year-long saturated soils including bogs, marshes, and wet meadows." AR 13238. Thus, while most (if not all) wetlands are riparian corridors, *not all riparian corridors are wetlands*. A riparian area may include (for example) an area with subsurface water, or an area with an ephemeral stream running through it, neither of which would be considered a wetland. Indeed, the Forest Plan itself recognizes that "[r]iparian areas are extremely variable." AR 12966. Thus, simply because the Forest Plan oc-

casionally uses these terms in tandem (or even interchangeably) does not change the conclusion that wetlands must contain certain distinguishing features that are not present in all riparian areas.

Accordingly, for the reasons set forth above, the Court DENIES the Center's motion for summary judgment and GRANTS the Federal Defendants' and the permittee's motions for summary judgment as to this claim.

## B. The Riparian Provision

Finally, the Center argues that the Proposed Action violates the Forest Plan's provision that the "proper allowable use within MA 12 is not to exceed 20 percent on the woody vegetation" (the "Riparian Provision"). AR 12970. In order to assess the specific arguments raised by the Center, the Court begins by providing an overview of the relevant portions of the Forest Plan, as well as a discussion of the Forest Service's interpretation of the Riparian Provision in the administrative proceedings below.

### 1. Management Areas and the Riparian Provision

In order to achieve its "mission, goals, and objectives," the Forest Plan sets forth several "management activities" (or "prescriptions") that are to be applied to land units that are called "management areas" ("MAs"). AR 12797. A management area is simply a "unit of land where a given prescription is to be applied." AR 12797. An MA need not be a contiguous area; indeed, separate areas within the Coconino National Forest are often grouped together into a single MA. AR 12797. Within each MA, the Forest Plan has detailed "program components"—activities that may take place in the MA—as well as "standards and guidelines" that "direct the timing and intensity of planned activities" and specify "policies that apply to activities." AR 12797–12798.

MA 12 covers riparian areas and open waters. AR 12966. One of the program components in this MA is "Range," or livestock grazing. AR 12970–12971. Among other standards and guidelines, livestock grazing in MA 12 is governed by the Riparian Provision, which (as recited above) provides that "[p]roper allowable use within MA 12 is not to exceed 20 percent on the woody vegetation." AR 12970. The term "proper allowable use" is synonymous with the term "utilization," which is defined as "[t]he proportion or degree of current year's forage [*i.e.*, plants available to livestock and wildlife for food] production by weight that is consumed or destroyed by animals." AR 25465. Stated differently, utilization is a "comparison of the amount of herbage left compared with the amount of herbage produced during the year." AR 25465. Thus, in its simplest terms, the Riparian Provision requires that no more than 20 percent of the "woody vegetation" in riparian areas can be consumed or destroyed by animals during a given year.

### 2. *The Forest Service's Interpretation of the Riparian Provision*

As noted above, the FCRA includes 332.7 acres of "riparian vegetation," 21.3 miles of streams (which includes riparian areas along Fossil Creek as well as riparian vegetation in intermittent drainages), and 20 springs and seeps. AR 25320. The Riparian Provision applies to all of these areas; however, in the 2013 EA, the Forest Service exempted a forty-foot section of Fossil Creek known as the Boulder Water Gap from the Riparian Provision's strictures. AR 25279. Fossil Creek is the only perennial stream on the FCRA; since 2009, livestock have only been able to access Fossil Creek at the Boulder Water Gap. AR 25264. In the 2013 EA, the Forest Service exempted the Boulder Water Gap from the Riparian Provision be-

cause, in its view, allowing livestock to access "a 40–foot section along Fossil Creek while excluding livestock access to the rest of the stream bank" was "an effective method for limiting stream and riparian impacts in grazed areas." AR 25279 n.2.

The Center challenged this exemption in its administrative appeal of the 2013 Decision Notice and FONSI. AR 34269–34270. On August 20, 2013, the Forest Service's Appeal Deciding Officer ("ADO") issued a decision affirming the 2013 Decision Notice and FONSI, but also "instructed" the "Responsible Official" that he or she was "required to manage livestock to remain within the 20 percent utilization on the woody vegetation standard/guideline *within the Boulder Water Gap* or amend the Forest Plan to provide for an exception to the standard/guideline." AR 34865 (emphasis added). Less than a month later, the ADO issued a "clarification" of his prior instruction, altering his direction to require the "Responsible Official" to "manage livestock to remain within the 20 percent utilization on the woody vegetation standard/guideline *within MA 12* or amend the Forest Plan to provide for an exception to the standard/guideline." AR 34919 (emphasis added).

Pursuant to these instructions, on November 14, 2013, the Red Rock District Ranger (now, Nicole Branton) issued the 2013 Fossil Creek Range Allotment Environmental Assessment Post–Decisional (Section 18) Review (the "Post–Decisional Review"), to determine whether allowing livestock to access the Boulder Water Gap was consistent with the Riparian Provision. AR 35130–35135. This determination required District Ranger Branton to decide the "*scale* [at which] the 20% utilization of riparian vegetation should be applied when managing livestock grazing." AR 35133 (emphasis added). In other words, District Ranger Branton had to determine

whether the 20 percent utilization limit "should be considered for every inch of riparian area or if it should be applied at a broader scale such as a pasture or allotment." AR 35133. District Ranger Branton concluded that the Riparian Provision should be applied at the *allotment* scale. AR 35133.

### 3. *Discussion*

The Center argues that both the Forest Service's interpretation and implementation of the Riparian Provision violate the Forest Plan. The Court addresses each contention in turn.

#### a. *The Interpretation of the Riparian Provision*

 The Center challenges District Ranger Branton's interpretation that the Riparian Provision may be applied at the allotment scale. "The Forest Service is entitled to deference to its interpretation of its own Forest Plans, unless the interpretation is plainly inconsistent with a Forest Plan." *Earth Island Inst. v. U.S. Forest Serv.,* 697 F.3d 1010, 1013 (9th Cir. 2012) (citation, internal quotation marks, and alterations omitted); *see also Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.,* 565 F.3d 545, 555 (9th Cir.2009) ("[W]e have effectively treated forest plan directives as equivalent to federal regulations adopted under the APA, deferring to the Forest Service's interpretation of plan directives that are susceptible to more than one meaning unless the interpretation is plainly erroneous or inconsistent with the directive."). Of course, "where 'neither the scope nor the effect' of the regulation in question is ambiguous, 'there is no call for deference to the agency's legal interpretation.' " *Siskiyou,* 565 F.3d at 555 (citation, internal quotation marks, and brackets omitted).

 The Riparian Provision itself is silent as to the scale at which it must be applied. However, the Center argues that the decision to apply the Riparian Provision at the allotment scale runs afoul of a separate provision of the Forest Plan; namely, the Forest Plan's general requirement that "[MA] Standards and Guidelines are specific either to the management area as a whole or to individual analysis areas in a management area." AR 12798. According to the Center, this directive requires the Forest Service to apply all standards and guidelines at either the "management area" scale or the "individual analysis area" scale. Because an allotment is neither a "management area" nor an "individual analysis area," the Center argues, applying the Riparian Provision at the allotment scale is inconsistent with the Forest Plan. Ctr.'s Op. Br. at 26.

The Court finds this argument unavailing for several reasons. First, it is not clear that the language recited above in fact dictates the level at which guidelines are to be applied. Stating that a guideline is "specific" to an MA or an analysis area does not necessarily mean that the guideline should be applied at this level: it could mean (for example) that the guideline applies only to that MA or analysis area. Second, it is unclear what the term "individual analysis area" means. The Forest Plan defines an analysis area as "[o]ne or more land areas combined for the purpose of analysis to formulate alternatives and estimate various impacts and affects." AR 13212. This vague definition might include allotments, pastures, or some other grouping of "land areas." The Forest Plan simply does not provide any further guidance.[13]

---

13. The Center argues that the term "analysis area" is synonymous with the term "key areas," which the Forest Plan defines as "[a]r-

eas of land or water that the responsible official and resource specialist determine to be important to wildlife or fish productivity."

Because neither the Riparian Provision, nor any other provision of the Forest Plan, specifies the scale at which the Riparian Provision must be applied, this Court must defer to the Forest Service's interpretation of the Riparian Provision "unless the interpretation is plainly erroneous or inconsistent with the directive." *Siskiyou,* 565 F.3d at 555; *see also Ecology Ctr. v. Castaneda,* 574 F.3d 652, 661 (9th Cir.2009) (holding that, where a Forest Plan "does not address" an issue, courts must "defer to the Forest Service's reasonable interpretation of the Forest Plan's requirements").

Here, it is clear that Forest Service's interpretation that the Riparian Provision should be applied at the allotment scale is neither plainly erroneous nor inconsistent with the Riparian Provision. Indeed, several of the Forest Plan directives suggest that the Riparian Provision should be applied at the allotment scale. For example, in a section instructing the Forest Service how it is to apply its prescriptions, the Forest Plan provides that, if a standard or guideline includes a percentage, then the "intent is to apply that prescription to [the specified percentage] of the acreage of each significantly sized *project.*" AR 12799 (emphasis added). Although the Forest Plan does not specifically define a "project," it does define a "proposed action" as a "*project,* activity or action proposed by a Federal agency that is the subject of an environmental assessment." AR 13242 (emphasis added). Proposed actions include (as the instant case illustrates) the reauthorization of an *allotment-wide* grazing permit. Accordingly, because the Forest Plan equates the term "project" with the term "proposed action," and because proposed actions can occur at the allotment scale, it was reasonable for

the Forest Service to conclude that the Riparian Provision should, in fact, be applied at the allotment scale.

Moreover, as District Ranger Branton explained in the Post–Decisional Review, the decision to apply the Riparian Provision at the allotment scale is consistent with the "[s]imilar guidelines in the same section of the Forest Plan," which "specifically identify the allotment scale as the appropriate scale for application of management direction." AR 35133. Specifically, the Forest Plan's directives on how to manage livestock grazing in MA 12 notes that "satisfactory riparian condition[s]" will be achieved "through completion of [ ] the development programs contained in the AMP's." AR 12970. As discussed above, AMPs detail "program[s] of action designated to reach a given set of objectives as the specific *allotment.*" *Buckingham,* 603 F.3d at 1076 (emphasis added). Because the Forest Plan specifically links recovery of riparian areas to programs contained in AMPs, and because AMPs apply their objectives at the allotment scale, it was reasonable for the Forest Service to conclude that the Riparian Provision also applies at the allotment scale.

Notwithstanding this analysis, the Center argues that the Forest Service's interpretation of the Riparian Provision is not entitled to deference for another reason. The Center argues that the Forest Service's interpretation of the Riparian Provision should be set aside because the "Forest Service has offered four different interpretations of the same standard/guideline at issue." Ctr.'s Op. Br. at 24.

AR 13222. The Center cites no authority in support of its argument that these terms are one and the same; moreover, it is plain from the very definition of the two terms that "analysis areas" and "key areas" are not the same thing.

■ This argument is both legally and factually incorrect. First, as a legal matter, the Ninth Circuit has held that "[t]he fact than agency's interpretation has fluctuated over time ... does not make it unworthy of deference." *Siskiyou,* 565 F.3d at 555 (citing *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan,* 555 U.S. 285, 296 n. 7, 129 S.Ct. 865, 172 L.Ed.2d 662 (2009)). Second, as a factual matter, the Forest Service has not "offered four different interpretations" of the Riparian Provision. None of the "interpretations" identified by the Center are inconsistent with the one set forth in the Post–Decisional Review, for the reasons set forth below:

- The 2013 EA's conclusion that the Boulder Water Gap would not be subject to the Riparian Provision: This statement does not discuss the proper scale at which the provision should be applied; instead, it simply concludes that the Boulder Water Gap is exempt from the Riparian Provision.

- The ADO's instruction that the Forest Service was "required to manage livestock to remain within the 20 percent utilization on the woody vegetation standard guideline within the Boulder Water Gap [later changed to 'with[in] MA 12'] or amend the Forest Plan to provide for an exception to the standard/guideline": This statement finds that Forest Service erred in exempting the Boulder Water Gap from the Riparian Provision, and instructs the Forest Service to remedy its error. It cannot fairly be read as offering an actual interpretation as to the proper scale at which the Riparian Provision should be applied.

- An interpretation of the Riparian Provision set forth in a separate Decision Notice and FONSI issued by the Forest Service *after* the Post–Decisional Review regarding a separate agency action on a different allotment (the West Windmill Allotment), which concluded that the Provision should be applied at the *pasture* scale: Although it does appear that the interpretations issued these two Decision Notices and FONSIs are inconsistent, under Ninth Circuit law, a Court's "review of an agency decision typically focuses on the administrative record in existence at the time of the decision," and "post-decision information ... may not be advanced as a new rationalization either for sustaining or attacking an agency's decision." *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.,* 100 F.3d 1443, 1450 (9th Cir.1996); *see also W. Watersheds Project v. Abbey,* 719 F.3d 1035, 1044 n. 4 (9th Cir.2013) (declining to review an agency document that conflicted with the agency's interpretation of a plan provision because the document was issued after the challenged decision).

Thus, at the time of its Post–Decisional Review, the Forest Service had not offered conflicting interpretations of the Riparian Provision; moreover, even if it had, its interpretation would still be entitled to deference.

In sum, for the reasons set forth above, the Forest Service's decision to apply the Riparian Provision at the allotment scale is neither "plainly erroneous [n]or inconsistent with" the Forest Plan. *Siskiyou,* 565 F.3d at 555. Accordingly, the Court DENIES the Center's motion for summary judgment and GRANTS the Federal Defendants' and permittee's motions for summary judgment as to this claim.

### b. The Implementation of the Riparian Provision

 Finally, the Center argues that, even if the Forest Service's interpretation of the Riparian Provision is correct, its implementation of the Riparian Provision is arbitrary and capricious. Specifically, the Center argues that the Forest Service erred by "foregoing any analysis and review of expected riparian utilization levels across the" FCRA. Ctr.'s Op. Br. at 27.[14] The Federal Defendants acknowledge that no analysis of the "expected riparian utilization levels across the" FCRA was conducted, but contend that no such study was required. Instead, the Federal Defendants argue, compliance with the Riparian Provision is ensured through a system of monitoring the woody vegetation in riparian areas and adjusting the way in which livestock grazing is managed should monitoring demonstrate that such adjustments are required.[15] *See* Fed. Defs.' Combined Mem. of Law in Support of Mo. for Summ. Jdgt. and in Opp. to Ctr's Mo. for Summ. Jdgt., Dkt. 108 at 34.

The Federal Defendants' position is supported by both case law and logic. In *Forest Guardians v. U.S. Forest Serv.,* 329 F.3d 1089 (9th Cir.2003), the Ninth Circuit concluded that a monitoring and adjustment plan similar to the one set forth in the Proposed Action was sufficient to ensure that the provisions of the relevant forest plan were being met. The plaintiff in *Forest Guardians* challenged a decision by the Forest Service to allocate 100 percent of the available forage to domesticated livestock, without allocating any to the wild ungulates (hoofed animals such as deer, big horn sheep, and elk) that inhabited the allotment. *Id.* at 1093. The plaintiff alleged that this decision was inconsistent with the relevant forest plan's requirement that the Forest Service needed to "consider the needs of neighboring wildlife." *Id.* at 1098. The Forest Service contended that it met this requirement, because it "actively monitor[ed] forage use and can prohibit or remove livestock from a pasture." *Id.*

The Ninth Circuit ruled for the Forest Service, concluding that its practice of "actively monitor[ing] forage use and ... prohibit[ing] or remov[ing] livestock from a pasture" ensured that the needs of wild ungulates were met. *Id.* The Court recognized that "it is very difficult to estimate climactic changes or to assert with any confidence how the wild ungulate population will change." *Id.* Moreover, the Court concluded that "[r]equiring the [Forest] Service to come up with a single estimate that can cover a ten-year time period would be unreasonable, if not pure folly." *Id.* at 1099. In light of these difficulties, the Court found that it was rational for the Forest Service to conclude that "monitoring was the only way to effectively predict wild ungulate use of the land." *Id.*

*Forest Guardians* controls here. Indeed, using a system of monitoring and management to comply with the Riparian Provision is even more rational in this case

---

**14.** This argument is not limited to livestock access to the Boulder Water Gap. Instead, the Center argues that the Forest Service was required to analyze whether the Proposed Action would be consistent with the Riparian Provision across "all 332.7 acres of riparian vegetation and ... 21.3 miles of perennial and intermittent streams in the [FCRA]." Ctr.'s Reply Br. at 23.

**15.** This system of monitoring and adjusting is specifically required under the terms of the Proposed Action. *See* AR 34120–34121 (providing that "[u]tilization monitoring would occur at the end of the growing season within each of the main grazing pastures," and that, "[i]f monitoring shows that the utilization guideline was exceed in a pasture, the grazing schedule and/or cattle numbers would be adjusted for the following year").

than it was in *Forest Guardians:* unlike the requirement to consider the "needs of neighboring wildlife," the Riparian Provision itself provides a directive as to how livestock is to be managed in MA 12. The Riparian Provision "direct[s] the timing and intensity of" livestock grazing, AR 12797–12798, by providing a ceiling on the amount of forage animals may consume in certain areas. It was logical for the Forest Service to conclude that it could comply with this provision by monitoring the amount of forage available and consumed during a given year, and adjust the number of livestock and the amount of time livestock spend in riparian areas in order to ensure compliance with the Riparian Provision. Indeed, the Center fails to suggest any alternative method that the Forest Service could have adopted. Moreover, as in *Forest Guardians,* asking the Forest Service to "come up with a single estimate" as to the utilization rate in riparian areas over the ten-year life of the grazing permit would "be unreasonable, if not pure folly." 329 F.3d at 1099. The amount of forage available in the riparian areas will vary over the years according to rainfall, the amount consumed by wild animals, and a wide range of other factors. Ensuring that no more than 20 percent of the woody vegetation in these areas is consumed by animals will require the Forest Service to make numerous adjustments to the number of domesticated livestock it permits on the FCRA, and the amount of time it spends in riparian zones. In light of these changing circumstances, it was rational for the Forest Service to conclude that "monitoring was the only way to effectively" ensure compliance with the Riparian Provision. *Id.*

Notwithstanding *Forest Guardians,* the Center argues that the Forest Service's plan of monitoring and adjustment runs afoul of a trio of Ninth Circuit precedents—*Lands Council v. McNair,* 537 F.3d 981 (9th Cir.2008) (en banc); *Earth Island Inst. v. U.S. Forest Serv.,* 442 F.3d 1147 (9th Cir.2006), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); and *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233 (9th Cir.2005). Each of these cases analyzed whether the Forest Service had employed a permissible methodology in determining whether a site-specific action complied with a substantive requirement of the NFMA (specifically, the requirement that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing ... species in the planning area," *Native Ecosystems,* 428 F.3d at 1249 (quoting 36 C.F.R. § 219.19 (2000)).

These precedents are distinguishable for two reasons. First, unlike the substantive NFMA requirement at issue in *Lands Council, Earth Island,* and *Native Ecosystems,* the Riparian Provision is an instruction on how livestock are to be managed within riparian areas. Thus, as explained above, it is not clear that a study can be conducted to determine whether the Proposed Action is in compliance with the Riparian Provision. Instead, compliance is ensured through a system of monitoring and adjustments to the way in which livestock are herded, like the one provided for in the Proposed Action. Second, unlike the Proposed Action, the "site specific actions" at issue in *Lands Council, Earth Island,* and *Native Ecosystems* were one-time logging projects whose effects on wildlife viability could not be managed and lessened over time. *See Lands Council,* 537 F.3d at 985–86; *Earth Island,* 442 F.3d at 1154–55; *Native Ecosystems,* 428 F.3d at 1236–37. These features of the Riparian Provision render it much more akin to the provision at issue in *Forest Guardians* than the one at the center of *Lands Council, Earth Island,* and *Native Ecosystems.*

In sum, the Forest Service did not err by failing to conduct an analysis of the expected riparian utilization levels across the FCRA. Accordingly, the Court DENIES the Center's motion for summary judgment and GRANTS the Federal Defendants' and permittee's motions for summary judgment as to this claim.

## VI. *Conclusion*

For the reasons set forth above, the Court GRANTS in part and DENIES in part the Center's motion for summary judgment. Specifically, the Court GRANTS the Center's motion for summary judgment as to its claim that the 2013 BiOp's no adverse modification determination related to the dispersal corridors is arbitrary and capricious, and DENIES the Center's remaining claims. In turn, the Court GRANTS in part and DENIES in part the Federal Defendants' and the permittee's motions for summary judgment. Specifically, the Court DENIES the Federal Defendants' and permittee's motions for summary judgment as to the Center's claim that the 2013 BiOp's no adverse modification determination related to the dispersal corridors is arbitrary and capricious, and GRANTS the motions as to the Center's remaining claims.

In accordance with the Court's scheduling order, a Rule 16 conference shall be scheduled by separate order to address the remedial phase of this litigation. Within 21 days of this order, the parties shall file either a stipulation or separate suggestions as to how the remedial phase of this action should be addressed at the Rule 16 conference.